1   **STEVEN F. HUBACHEK**
    California Bar No. 147703
2   **DAVID M.C. PETERSON**
    California Bar No. 254498
3   FEDERAL DEFENDERS OF SAN DIEGO, INC.
    225 Broadway, Suite 900
4   San Diego, California 92101-5008
    Telephone: (619) 234-8467
5   Facsimile: (619) 687-2666
    Steven_Hubachek@fd.org
6
    Attorneys for Mr. Urueta-Herrejon
7

8                    UNITED STATES DISTRICT COURT

9                   SOUTHERN DISTRICT OF CALIFORNIA

10                    **(HONORABLE LARRY A. BURNS)**

11  UNITED STATES OF AMERICA,          ) Case No. 08CR0549-LAB
                                       )
12          Plaintiff,                 ) Date: April 14, 2008
                                       ) Time: 2:00 p.m.
13  v.                                 )
                                       ) STATEMENT OF FACTS AND
14  SERGIO URUETA-HERREJON,            ) MEMORANDUM OF POINTS AND
                                       ) AUTHORITIES IN SUPPORT OF
15          Defendant.                 ) DEFENDANT'S MOTIONS
    _____)
16

17                              I.

18                    **STATEMENT OF FACTS**

19          On February 17, 2008, Mr. Urueta Herrejon was arrested, on Highway 98 east of Calexico, as the

20  alleged driver of a motor home containing ten undocumented aliens. At approximately 5:10 a.m., a remote

21  video surveillance operator purportedly saw a group of individuals enter a "large van-type vehicle" south

22  of the east bound lanes of I-8.

23          A van-type vehicle was never seen again, but Border Patrol Agent Contreras, a canine officer driving

24  an unmarked vehicle, decided to follow a motor home that he observed enter Highway 98 from Interstate

25  8. The motor home that Contreras chose to follow was most certainly not a van, or even a van-type vehicle;

26  it is a motor home. Even so, he followed the motor home, and ultimately turned on his lights and sirens.

27  The vehicle was then disabled by a spike strip used by Border Patrol Agent Vega Torres. Although

28  discovery materials indicate that the motor home failed to yield, counsel has reviewed a compact disc

containing the dispatch communications, and there is no indication in those communications that there was a failure to yield. *See Declaration of Jack Kairy* at 1-2, attached hereto as Ex. A. In fact, Agent Vega Torres requested and received permission to use a spike strip long before the stop, and made no mention of a (future) failure to yield.

After the motor home was stopped via the spike strip, Agent Contreras entered the motor home through a side door. He did not request permission to enter the motor home. *See* Ex. A at 2. In the motor home, he observed a number of people. He removed Mr. Urueta Herrejon from the vehicle and separated him from the group.

The group and Mr. Urueta Herrejon were transported to the Border Patrol Station. There, Mr. Urueta Herrejon was interrogated by F.O.S. Nelson Attiles. A video and audio record was made of the interrogation. A dvd of the interrogation was received by counsel on Thursday, March 20, 2008. It is in Spanish, and there obviously has not been time to transcribe it. The following facts are based on an oral summary of the purported waiver of Mr. Urueta Herrejon's rights.

As is reflected in Border Patrol Agent Sarah Felix's report, a copy of which is attached hereto as Exhibit B, Mr. Urueta Herrejon was first provided with administrative warnings. *See* Ex. B at 4. Such warnings are normally associated with processing an alien for return to Mexico. Indeed, Mr. Urueta Herrejon has been apprehended by Border Patrol Agents three times but never prosecuted, *see id.* at 5, so he would be familiar with administrative processing but not the process of prosecution.

Agent Felix's report reflects that Attiles recognized the tension between the administrative rights and the *Miranda* warnings, and addressed that tension with specific warnings.

> During a video-taped sworn statement, ... Attiles advised [Mr.] Urueta-Herrejon ... that his administrative rights no longer applied because he was going to be processed under AUSA guidelines for criminal prosecution of 8 USC 1324, Alien Smuggling. URUETA was advised that the Miranda rights would now take the place of his Administrative Rights.

*See* Ex. B at 4. Perhaps that stilted language might possibly clarify the confusing amalgam of rights provided to Mr. Urueta Herrejon. Perhaps not. This case will not answer that question, however, because Felix's report is a complete fabrication: Attiles never explained the administrative/criminal dichotomy. *See* Ex. A at 1. Not only that, when Nr. Urueta Herrejon inquired, during the purported waiver discussion, as to whether he would be deported as a driver, Attiles said "yes." *See id.* Attiles did not explain that, contrary

1    to Mr. Urueta Herrejon's past experience, deportation would only occur after prosecution and the service of

2    any sentence imposed.  That is promoting, rather than dispelling, confusion.

3        The video makes clear Attiles is reading from a script.  That document has not been produced in

4    discovery.  Nor have the administrative warnings referenced by Agent Felix been produced.  Those failures

5    preclude full litigation of the effectiveness of any purported *Miranda* waiver at this point.

6        Several of the aliens found in the motor home were also interrogated.  In addition to being

7    questioned, these aliens were also asked to participate in an "identification" process.  They were shown a

8    photographic lineup containing six photographs on a single page.  *See* Ex. A at 2.  The questioning as to all

9    three material witnesses was highly suggestive.  The aliens were asked to identify the driver from the

10   photographs rather than being told that a suspect was not necessarily depicted in any photograph.  *See id.*

11   Thus, the migrants knew that if they recognized only one person, that person must have been the driver.

12       The photographic lineup has not been produced.

**II.**

**MOTION TO COMPEL DISCOVERY/PRESERVE EVIDENCE**

15       Mr. Urueta Herrejon moves for the production of the following discovery.  This request is not limited

16   to those items that the prosecutor knows of, but rather includes all discovery listed below that is in the

17   custody, control, care, or knowledge of any "closely related investigative [or other] agencies."  *See United*

18   *States v. Bryan*, 868 F.2d 1032 (9th Cir. 1989).

19       (1)  The Defendant's Statements.  The government must disclose to the defendant all copies of any

20   written or recorded statements made by the defendant; the substance of any statements made by the

21   defendant which the government intends to offer in evidence at trial; any response by the defendant to

22   interrogation; the substance of any oral statements which the government intends to introduce at trial and

23   any written summaries of the defendant's oral statements contained in the handwritten notes of the

24   government agent; any response to any *Miranda* warnings which may have been given to the defendant; as

25   well as any other statements by the defendant.  Fed. R. Crim. P. 16(a)(1)(A).

26       (2)  Arrest Reports, Notes and Dispatch Tapes.  The defendant also specifically requests the

27   government to turn over all arrest reports, notes, dispatch or any other tapes, and TECS records that relate

28   to the circumstances surrounding his arrest or any questioning.  This request includes, but is not limited to,

any rough notes, records, reports, transcripts or other documents in which statements of the defendant or any other discoverable material is contained. Such material is discoverable under Fed. R. Crim. P. 16(a)(1)(A) and *Brady v. Maryland*, 373 U.S. 83 (1963). The government must produce arrest reports, investigator's notes, memos from arresting officers, dispatch and other tapes, sworn statements, and prosecution reports pertaining to the defendant and his arrest. See Fed. R. Crim. P. 16(a)(1)(B) and (C), Fed. R. Crim. P. 26.2 and 12(I).

(3) Brady Material. The defendant requests all documents, statements, agents' reports, and tangible evidence favorable to the defendant on the issue of guilt and/or which affects the credibility of the government's case. Under *Brady*, impeachment as well as exculpatory evidence falls within the definition of evidence favorable to the accused. *United States v. Bagley*, 473 U.S. 667 (1985).

(4) Any Information That May Result in a Lower Sentence Under The Guidelines. The government must produce this information under *Brady*, 373 U.S. 83. This request includes any cooperation or attempted cooperation by the defendant as well as any information that could affect any base offense level or specific offense characteristic under Chapter Two of the Guidelines. The defendant also requests any information relevant to a Chapter Three adjustment, a determination of the defendant's criminal history, and information relevant to any other application of the Guidelines.

(5) The Defendant's Prior Record. The defendant requests disclosure of his prior record. Fed. R. Crim. P. 16(a)(1)(B).

(6) Any Proposed 404(b) Evidence. The government must produce evidence of prior similar acts under Fed. R. Crim. P. 16(a)(1)(C) and Fed. R. Evid. 404(b) and 609. In addition, under Rule 404(b), "upon request of the accused, the prosecution . . . shall provide reasonable notice in advance of trial . . . of the general nature" of any evidence the government proposes to introduce under Rule 404(b) at trial. The defendant requests such notice at least two weeks before trial.

(7) Evidence Seized. The defendant requests production of evidence seized as a result of any search, either warrantless or with a warrant. Fed. R. Crim. P. 16(a)(1)(C).

(8) Request for Preservation of Evidence. The defendant specifically requests the preservation of all dispatch or other tapes or any other physical evidence that may be destroyed, lost, or otherwise put out of the possession, custody, or care of the government and which relate to the arrest or the events leading to

4

1    the arrest in this case. This request includes, but is not limited to, the marijuana plants and any samples of

2    narcotics used to run any scientific tests, any narcotics, the results of any fingerprint analysis, the defendant's

3    personal effects, and any evidence seized from the defendant or any third party.

4        Mr. Urueta Herrejon requests that the Assistant U. S. Attorney assigned to this case oversee a review

5    of all personnel files of each agent involved in the present case for impeachment material. *United States v.*

6    *Henthorn*, 931 F.2d 29 (9th Cir. 1991). *But see United States v. Herring*, 83 F.3d 1120 (9th Cir. 1996).

7        (9) <u>Tangible Objects</u>. The defendant requests the opportunity to inspect and copy as well as test,

8    if necessary, all other documents and tangible objects, including photographs, books, papers, documents,

9    alleged narcotics, fingerprint analyses, vehicles, or copies of portions thereof, which are material to the

10    defense or intended for use in the government's case-in-chief or were obtained from or belong to the

11    defendant. Fed. R. Crim. P. 16(a)(1)(C). The defendant requests a copy of the form containing the *Miranda*

12    warnings allegedly read to him, and any other warnings provided to him.

13        (10) <u>Expert Witnesses</u>. The defendant requests the name, qualifications, and a written summary of

14    the testimony of any person that the government intends to call as an expert witness during its case in chief.

15    Fed. R. Crim. P. 16(a)(1)(E).

16        (11) <u>Evidence of Bias or Motive to Lie</u>. The defendant requests any evidence that any prospective

17    government witness is biased or prejudiced against the defendant, or has a motive to falsify or distort his or

18    her testimony.

19        (12) <u>Impeachment Evidence</u>. The defendant requests any evidence that any prospective government

20    witness has engaged in any criminal act whether or not resulting in a conviction and whether any witness

21    has made a statement favorable to the defendant. <u>See</u> Fed. R. Evid. 608, 609 and 613; *Brady v. Maryland*.

22        (13) <u>Evidence of Criminal Investigation of Any Government Witness</u>. The defendant requests any

23    evidence that any prospective witness is under investigation by federal, state or local authorities for any

24    criminal conduct.

25        (14) <u>Evidence Affecting Perception, Recollection, Ability to Communicate, or Truth Telling</u>. The

26    defense requests any evidence, including any medical or psychiatric report or evaluation, that tends to show

27    that any prospective witness' ability to perceive, remember, communicate, or tell the truth is impaired, and

28    //

any evidence that a witness has ever used narcotics or other controlled substance, or has ever been an alcoholic.

(15)  <u>Witness Addresses</u>.  The defendant requests the name and last known address of each prospective government witness.  The defendant also requests the name and last known address of every witness to the crime or crimes charged (or any of the overt acts committed in furtherance thereof) who will <u>not</u> be called as a government witness.

(16)  <u>Name of Witnesses Favorable to the Defendant</u>.  The defendant requests the name of any witness who made an arguably favorable statement concerning the defendant or who could not identify him or who was unsure of his identity, or participation in the crime charged.

(17)  <u>Statements Relevant to the Defense</u>.  The defendant requests disclosure of any statement relevant to any possible defense or contention that he might assert.

(18)  <u>Jencks Act Material</u>.  The defendant requests production in advance of trial of all material, including dispatch tapes, which the government must produce pursuant to the Jencks Act, 18 U.S.C. § 3500. Advance production will avoid the possibility of delay at the request of defendant to investigate the Jencks material.  A verbal acknowledgment that "rough" notes constitute an accurate account of the witness' interview is sufficient for the report or notes to qualify as a statement under section 3500(e)(1).  *Campbell v. United States*, 373 U.S. 487, 490-92 (1963).  *United States v. Boshell*, 952 F.2d 1101 (9th Cir. 1991), holds that when an agent goes over interview notes with the subject of the interview the notes are then subject to the Jencks Act.

(19)  <u>Giglio Information</u>.  Pursuant to *Giglio v. United States*, 405 U.S. 150 (1972), the defendant requests all statements and/or promises, express or implied, made to any government witnesses, in exchange for their testimony in this case, and all other information which could arguably be used for the impeachment of any government witnesses.

(20)  <u>Informants and Cooperating Witnesses</u>.  The defendant requests disclosure of the names and addresses of all informants or cooperating witnesses used or to be used in this case, and in particular, disclosure of any informant who was a percipient witness in this case or otherwise participated in the crime charged against Mr. Urueta Herrejon and/or in the investigation that resulted in the instant charges.  The government must disclose the informant's identity and location, as well as disclose the existence of any other

1   percipient witness unknown or unknowable to the defense. *Roviaro v. United States*, 353 U.S. 52, 61-62

2   (1957). The government must disclose any information derived from informants which exculpates or tends

3   to exculpate the defendant.

4   (21) <u>Bias by Informants or Cooperating Witnesses</u>. The defendant requests disclosure of any

5   information indicating bias on the part of any informant or cooperating witness. *Giglio*, 405 U.S. 150.

6   (22) <u>Residual Request</u>. Mr. Urueta Herrejon intends by this discovery motion to invoke his rights

7   to discovery to the fullest extent possible under the Federal Rules of Criminal Procedure and the

8   Constitution and laws of the United States. Mr. Urueta Herrejon requests that the government provide him

9   and his attorney with the above requested material sufficiently in advance of trial to avoid unnecessary delay

10  prior to cross-examination.

11  **III.**

12  **THE INDICTMENT SHOULD BE DISMISSED BECAUSE THE INSTRUCTIONS GIVEN TO
    THE GRAND JURY FORBID THAT BODY FROM  FULFILLING ITS TRADITIONAL ROLE.**

13

14  The indictment in the instant case was returned by the January 2007 grand jury. *See Reporter's*

15  *Partial Transcript of the Proceedings* (hereafter "Instructions"), dated January 11, 2007.[1] The instructions

16  deviate, in several ways, from the instructions at issue in the major Ninth Circuit cases challenging a form

17  grand jury instruction previously given in this district.[2]

18  After repeatedly emphasizing to the grand jurors that probable cause determination was their sole

19  responsibility, *see Instructions* at 3, 3-4, 5, this Court instructed the grand jurors that they were forbidden

20  "from judg[ing] the wisdom of the criminal laws enacted by Congress; that is, whether or not there should

21  be a federal law or should not be a federal law designating certain activity [as] criminal is not up to you."

22  *See id.* at 8. The instructions go beyond that, however, and tell the grand jurors that, should "you disagree

23  with that judgment made by Congress, then your option is not to say 'well, I'm going to vote against indicting

24  even though I think that the evidence is sufficient' or 'I'm going to vote in favor of even though the evidence

25  [1] Because this motion has been filed several times, counsel is not attaching the (lengthy) transcripts
    cited herein.

26

27  [2] *See, e.g.*, *United States v. Cortez-Rivera*, 454 F.3d 1038 (9th Cir. 2006); *United States v. Navarro-
    Vargas*, 408 F.3d 1184 (9th Cir.) (en banc), *cert. denied*, 126 S. Ct. 736 (2005) (*Navarro-Vargas II*); *United*
    *States v. Navarro-Vargas*, 367 F.3d 896 (9th Cir. 2004)(*Navarro-Vargas I*); *United States v. Marcucci*, 299

28  F.3d 1156 (9th Cir. 2002) (per curiam).

7

1   may be insufficient.'" *See id.* at 8-9. Thus, the instruction flatly bars the grand jury from declining to indict

2   because the grand jurors disagree with a proposed prosecution.

3       Immediately before limiting the grand jurors' powers in the way just described, this Court referred

4   to an instance in the grand juror selection process in which it excused three potential jurors. *See id.* at 8.

5       I've gone over this with a couple of people. You understood from the questions and answers
        that a couple of people were excused, I think three in this case, because they could not adhere
6       to the principle that I'm about to tell you.

7   *Id.* That "principle" was this Court's discussion of the grand jurors' inability to give effect to their

8   disagreement with Congress. *See id.* at 8-9. Thus, this Court not only instructed the grand jurors on its view

9   of their discretion; it enforced that view on pain of being excused from service as a grand juror.

10      In addition to its instructions on the authority to choose not to indict, this Court also assured the

11  grand jurors that prosecutors would present to them evidence that tended to undercut probable cause. *See*

12  *id.* at 20.

13      Now, again, this emphasizes the difference between the function of the grand jury and the
        trial jury. You're all about probable cause. If you think that there's evidence out there that
14      might cause you to say "well, I don't think probable cause exists," then it's incumbent upon
        you to hear that evidence as well. As I told you, in most instances, *the U.S. Attorneys are*
15      *duty-bound to present evidence that cuts against what they may be asking you to do if they're*
        *aware of that evidence.*
16

17  *Id.* (emphasis added). This Court later returned to the notion of the prosecutors and their duties, advising

18  the grand jurors that they "can expect that the U.S. Attorneys that will appear in from of [them] will be

    candid, they'll be honest, and ... they'll act in good faith in all matters presented to you." *See id.* at 27.

19      Mr. Urueta Herrejon was indicted by the January 2007 grand jury on February 28, 2008.

20
**A.**  ***Navarro-Vargas* Establishes Limits on the Ability of Judges to Constrain the Powers of the**
21      **Grand Jury.**

22      The Ninth Circuit has, over vigorous dissents, rejected challenges to various instructions given to

23  grand jurors in the Southern District of California. *See Navarro-Vargas II*, 408 F.3d 1184. While the Ninth

24  Circuit has thus far (narrowly) rejected such challenges, it has, in the course of adopting a highly formalistic

25  approach[3] to the problems posed by the instructions, endorsed many of the substantive arguments raised by

26  _____

27      [3]  *See Navarro-Vargas II*, 408 F.3d at 1210-11 (Hawkins, J., dissenting) (criticizing the majority
    because "[t]he instruction's use of the word 'should' is most likely to be understood as imposing an inflexible
28  'duty or obligation' on grand jurors, and thus to circumscribe the grand jury's constitutional independence.").

the defendants in those cases. This Court's instructions cannot be reconciled with the role of the grand jury as set forth in *Navarro-Vargas II*.

For instance, with respect to the grand jury's relationship with the prosecution, the *Navarro-Vargas II* majority acknowledges that the two institutions perform similar functions: "'the public prosecutor, in deciding whether a particular prosecution shall be instituted or followed up, performs much the same function as a grand jury.'" *Navarro-Vargas II*, 408 F.3d at 1200 (quoting *Butz v. Economou*, 438 U.S. 478, 510 (1978)). *Accord Navarro-Vargas I*, 367 F.3d at 900 (Kozinski, J., dissenting) (The grand jury's discretion in this regard "is most accurately described as prosecutorial." ). *See also Navarro-Vargas II*, 408 F.3d at 1213 (Hawkins, J., dissenting). It recognizes that the prosecutor is not obligated to proceed on any indictment or presentment returned by a grand jury, *id.*, but also that "the grand jury has no obligation to prepare a presentment or to return an indictment drafted by the prosecutor." *Id. See* Niki Kuckes, *The Democratic Prosecutor: Explaining the Constitutional Function of the Federal Grand Jury*, 94 Geo. L.J. 1265, 1302 (2006) (the grand jury's discretion not to indict was "'arguably . . . the most important attribute of grand jury review from the perspective of those who insisted that a grand jury clause be included in the Bill of Rights'") (quoting Wayne LaFave et al., *Criminal Procedure* § 15.2(g) (2d ed. 1999)).

Indeed, the *Navarro-Vargas II* majority agrees that the grand jury possesses all the attributes set forth in *Vasquez v. Hillery*, 474 U.S. 254 (1986). *See id.*

> The grand jury thus determines not only whether probable cause exists, but also whether to "charge a greater offense or a lesser offense; numerous counts or a single count; and perhaps most significant of all, a capital offense or a non-capital offense -- all on the basis of the same facts." ... And, significantly, the grand jury may refuse to return an indictment even "'where a conviction can be obtained.'"

*Id.* (quoting *Vasquez*, 474 U.S. at 263). The Supreme Court has itself reaffirmed *Vasquez*'s description of the grand jury's attributes in *Campbell v. Louisiana*, 523 U.S. 392 (1998), noting that the grand jury "controls not only the initial decision to indict, but also significant questions such as how many counts to charge and whether to charge a greater or lesser offense, including the important decision whether to charge a capital crime." *Id.* at 399 (citing *Vasquez*, 474 U.S. at 263).

Judge Hawkins notes that the *Navarro-Vargas II* majority accepts the major premise of *Vasquez*: "the majority agrees that a grand jury has the power to refuse to indict someone even when the prosecutor has established probable cause that this individual has committed a crime." *See id.* at 1214 (Hawkins, J.

1  dissenting).  *Accord Navarro-Vargas I*, 367 F.3d at 899 (Kozinski, J., dissenting); *Marcucci*, 299 F.3d at

2  1166-73 (Hawkins, J., dissenting).  In short, the grand jurors' prerogative not to indict enjoys strong support

3  in the Ninth Circuit.  But not in the instructions given to the January 2007 grand jury.

4  **B.**     **The Instructions Forbid the Exercise of Grand Jury Discretion Established in Both *Vasquez***
     **and *Navarro-Vargas II*.**

5

6        The *Navarro-Vargas II* majority found that the instruction in that case "leave[s] room for the grand

7  jury to dismiss even if it finds probable cause," 408 F.3d at 1205, adopting the analysis in its previous

8  decision in *Marcucci*.  *Marcucci* reasoned that the instructions do not mandate that grand jurors indict upon

9  every finding of probable cause because the term "should" may mean "what is probable or expected."  299

10 F.3d at 1164 (citation omitted).  That reading of the term "should" makes no sense in context, as Judge

11 Hawkins ably pointed out.  *See Navarro-Vargas II*, 408 F.3d at 1210-11 (Hawkins, J., dissenting) ("The

12 instruction's use of the word 'should' is most likely to be understood as imposing an inflexible 'duty or

13 obligation' on grand jurors, and thus to circumscribe the grand jury's constitutional independence.").  *See*

14 *also id.* ("The 'word' should is used to express a duty [or] obligation.") (quoting *The Oxford American*

15 *Diction and Language Guide* 1579 (1999) (brackets in original)).

16        The debate about what the word "should" means is irrelevant here; the instructions here make no

17 such fine distinction.  The grand jury instructions make it painfully clear that grand jurors simply may not

18 choose not to indict in the event of what appears to them to be an unfair application of the law: should "you

19 disagree with that judgment made by Congress, then your option is not to say 'well, I'm going to vote against

20 indicting even though I think that the evidence is sufficient'...." *See Instructions* at 8-9.  Thus, the instruction

21 flatly bars the grand jury from declining to indict because they disagree with a proposed prosecution.  No

22 grand juror would read this language as instructing, or even allowing, him or her to assess "the need to

23 indict." *Vasquez*, 474 U.S. at 264.

24        Nor is the *Navarro-Vargas II* majority's faith in the structure of the grand jury a cure for the

25 instructions' excesses.  The *Navarro-Vargas II* majority attributes "[t]he grand jury's discretion -- its

26 independence -- [to] the absolute secrecy of its deliberations and vote and the unreviewability of its

27 decisions." 408 F.3d at 1200.  As a result, the majority discounts the effect that a judge's instructions may

28 //

10

1  have on a grand jury because "it is the *structure* of the grand jury process and its *function* that make it

2  independent." *Id.* at 1202 (emphases in the original).

3      Judge Hawkins sharply criticized this approach. The majority, he explains, "believes that the

4  'structure' and 'function' of the grand jury -- particularly the secrecy of the proceedings and unreviewability

5  of many of its decisions -- sufficiently protects that power." *See id.* at 1214 (Hawkins, J., dissenting). The

6  flaw in the majority's analysis is that "[i]nstructing a grand jury that it lacks power to do anything beyond

7  making a probable cause determination ... unconstitutionally undermines the very structural protections that

8  the majority believes save[] the instruction." *Id.* After all, it is an "'almost invariable assumption of the law

9  that jurors follow their instructions.'" *Id.* (quoting *Richardson v. Marsh*, 481 U.S. 200, 206 (1987)). If that

10  "invariable assumption" were to hold true, then the grand jurors could not possibly fulfill the role described

11  in *Vasquez*. Indeed, "there is something supremely cynical about saying that it is fine to give jurors

12  erroneous instructions because nothing will happen if they disobey them." *Id.*

13      In setting forth Judge Hawkins' views, Mr. Urueta Herrejon understands that this Court may not

14  adopt them solely because the reasoning that supports them is so much more persuasive than the majority's

15  sophistry. Rather, he sets them forth to urge the Court *not to extend* what is already untenable reasoning.

16      Here, again, the question is not an obscure interpretation of the word "should", but an absolute ban

17  on the right to refuse to indict that directly conflicts with the recognition of that right in *Vasquez*, *Campbell*,

18  and both *Navarro-Vargas II* opinions. *Navarro-Vargas II* is distinguishable on that basis, but not only that.

19      This Court's interactions with two potential grand jurors who indicated that, in some unknown set

20  of circumstances, they might decline to indict even where there was probable cause, emphasize this mistaken

21  view of grand jury discretion. Because of the redactions of the grand jurors' names, Mr. Urueta Herrejon

22  will refer to them by occupation. One is a retired clinical social worker (hereinafter CSW), and the other

23  is a real estate agent (hereinafter REA). The CSW indicated a view that no drugs should be considered

24  illegal and that some drug prosecutions were not an effective use of resources. *See Voir Dire Transcript* at

25  16. The CSW was also troubled by certain unspecified immigration cases. *See id.*

26      This Court did not determine what sorts of drug and immigration cases troubled the CSW. It never

27  inquired as to whether the CSW was at all troubled by the sorts of cases actually filed in this district, such

28  as drug smuggling cases and cases involving reentry after deportation and alien smuggling. Rather, it

1  provided instructions suggesting that, in any event, any scruples LCW may have possessed were simply not

2  capable of expression in the context of grand jury service.

3  > Now, the question is can you fairly evaluate [drug cases and immigration cases]? Just as the
   > defendant is ultimately entitled to a fair trial and the person that's accused is entitled to a fair
4  > appraisal of the evidence of the case that's in front of you, so, too, is the United States
   > entitled to a fair judgment. If there's probable cause, then the case should go forward. *I*
5  > *wouldn't want you to say*, "well, yeah, there's probable cause, but I still don't like what our
   > government is doing. I disagree with these laws, so I'm not going to vote for it to go
6  > forward." If that is your frame of mind, the probably you shouldn't serve. Only you can tell
   > me that.

7

8  *See id.* at 16-17 (emphasis added). Thus, without any sort of context whatsoever, this Court let the grand

9  juror know that he would not want him or her to decline to indict in an individual case where the grand juror

10 "[didn't] like what our government is doing," *see id.* at 17, but in which there was probable cause. *See id.*

11 Such a case "should go forward." *See id.* Given that blanket proscription on grand juror discretion, made

12 manifest by this Court's use of the pronoun "I", the CSW indicated that it "would be difficult to support a

13 charge even if [the CSW] thought the evidence warranted it." *See id.* Again, this Court's question provided

14 no context; it inquired regarding "a case," a term presumably just as applicable to possession of a small

15 amount of medical marijuana as kilogram quantities of methamphetamine for distribution. Any grand juror

16 listening to this exchange could only conclude that there was *no* case in which this Court would permit them

17 to vote "no bill" in the face of a showing probable cause.

18 That same point was emphasized in this Court's exchange with REA. REA first advised the Court

19 of a concern regarding the "disparity between state and federal law" regarding "medical marijuana." *See id.*

20 at 24. This Court first sought to address REA's concerns about medical marijuana by stating that grand

21 jurors, like trial jurors, are simply forbidden from taking penalty considerations into account.

22 > Well, those things -- the consequences of your determination shouldn't concern you in the
   > sense that penalties or punishment, things like that -- we tell trial jurors, of course, that they
23 > cannot consider the punishment or the consequence that Congress has set for these things.
   > We'd ask you to also abide by that. We want you to make a business-like decision of whether
24 > there was a probable cause. ...

25 *Id.* at 24-25. Having stated that REA was to "abide" by the instruction given to trial jurors, this Court went

26 on to suggest that REA recuse him or herself from medical marijuana cases. *See id.* at 25.

27 //

28 //

1   In response to further questioning, REA disclosed REA's belief "that drugs should be legal."  *See id.*

2   That disclosure prompted this Court to begin a discussion that ultimately led to an instruction that a grand

3   juror is obligated to vote to indict if there is probable cause.

4   
5   I can tell you sometimes I don't agree with some of the legal decisions that are indicated that I have to make.  But my alternative is to vote for someone different, vote for someone that supports the policies I support and get the law changed.  It's not for me to say, "well, I don't like it.  So I'm not going to follow it here."

6   
7   You'd have a similar obligation as a grand juror even though you might have to grit your teeth on some cases.  Philosophically, if you were a member of congress, you'd vote against, for example, criminalizing marijuana.  I don't know if that's it, but you'd vote against criminalizing some drugs.

8   
9   
10  That's not what your prerogative is here.  You're prerogative instead is to act like a judge and say, "all right.  This is what I've to deal with objectively.  Does it seem to me that a crime was committed?  Yes.  Does it seem to me that this person's involved?  It does." *And then your obligation, if you find those to be true, would be to vote in favor of the case going forward.*

11  *Id.* at 26-27 (emphasis added).  Thus, the grand juror's duty is to conduct a simple two part test, which, if

12  both questions are answered in the affirmative, lead to an "obligation" to indict.

13  Having set forth the duty to indict, and being advised that REA was "uncomfortable" with that

14  paradigm, this Court reinforced the "obligation" to indict in every case in which there was probable cause.

15  The Court: do you think you'd be inclined to let people go in drug cases even though you were convinced there was probable cause they committed a drug offense?
16  REA: It would depend on the case.
    The Court: Is there a chance that you would do that?
17  REA: Yes.
    The Court: I appreciate your answers.  I'll excuse you at this time.

18  

19  *Id.* at 27.  Two aspects of this exchange are crucial.  First, REA plainly does not intend to act solely on his

20  political belief in decriminalization -- whether he or she would indict "depend[s] on the case," *see id.*, as it

21  should.  Because REA's vote "depend[s] on the case," *see id.*, it is necessarily true that REA would vote to

22  indict in some (perhaps many or even nearly all) cases in which there was probable cause.  Again, this Court

23  did not explore REA's views; it did not ascertain what sorts of cases would prompt REA to hesitate.  The

24  message is clear: it does not matter what type of case might prompt REA's reluctance to indict because, once

25  the two part test is satisfied, the "obligation" is "to vote in favor of the case going forward."  *See id.* at 27.

26  That is why even the "chance," *see id.*, that a grand juror might not vote to indict was too great a risk to run.

27  The structure of the grand jury and the secrecy of its deliberations cannot embolden grand jurors who

28  are no longer serving, apparently because they expressed their willingness to act as the conscience of the

13

1    community. *See Navarro-Vargas II*, 408 F.3d at 1210-11 (Hawkins, J., dissenting) (a grand jury exercising

2    its powers under *Vasquez* "serves ... to protect the accused from the other branches of government by acting

3    as the 'conscience of the community.'") (quoting *Gaither v. United States*, 413 F.2d 1061, 1066 & n.6 (D.C.

4    Cir. 1969)). The federal courts possess only "very limited" power "to fashion, on their own initiative, rules

5    of grand jury procedure," *United States v. Williams*, 504 U.S. 36, 50 (1992), and, here, this Court has both

6    fashioned his own rules and enforced them. The instructions here are therefore structural error. *See*

7    *Navarro-Vargas II*, 408 at 1216-17 (Hawkins, J., dissenting). The indictment must be dismissed.

8       Nor can the word games played by the *Navarro-Vargas II* and *Marcucci* save the instructions: *in*

9    *their entirety*, the instructions prohibited the grand jury from exercising the discretion established in both

10   *Vasquez* and *Navarro-Vargas II*, specifically the discretion to not indict even if the grand jury finds probable

11   cause. *See Vasquez*, 474 U.S. at 264; *Navarro-Vargas II*, 408 F.3d at 1200. As noted above, because the

12   model charge "does not state that the jury 'must' or 'shall' indict, but merely that it 'should' indict if it finds

13   probable cause," *Navarro-Vargas II* held that the instruction did not violate the grand jury's independence.

14   *See* 408 F.3d at 1205. Resort to that unlikely reading of the word "should" is to no avail here.

15       It is true that on several occasions, this Court used the word "should" instead of "shall" with respect

16   to whether an indictment was required if probable cause existed. In context, however, it is clear that the

17   Court could only mean "should" in the obligatory sense. For example, when addressing a prospective juror,

18   this Court not only told the jurors that they "should" indict if there is probable cause, it told them that if there

19   is not probable cause, "then the grand jury should hesitate and not indict." *See Voir Dire* at 8. At least in

20   context, it would strain credulity to suggest that this Court was using "should" for the purpose of "leaving

21   room for the grand jury to [indict] even if it finds [no] probable cause." *See Navarro-Vargas*, 408 F.3d at

22   1205.

23       The full passage cited above effectively eliminates any possibility that this Court intended the

24   *Navarro-Vargas* spin on the word "should."

> [T]he grand jury is determining really two factors: "do we have a reasonable belief that a
> crime was committed? And second, do we have a reasonable belief that the person that they
> propose that we indict committed the crime?"
>
>      If the answer is "yes" to both of those, then the case should move forward. If the
> answer to either of the questions is "no," then the grand jury should not hesitate and not
> indict.

1    *See Voir Dire* at 8.  Of the two sentences containing the word "should," the latter of the two essentially states

2    that if there is no probable cause, you *should* not indict.  This Court could not possibly have intended to

3    "leav[e] room for the grand jury to [indict] even if it finds [no] probable cause." *See Navarro-Vargas II*, 408

4    F.3d at 1205 (citing *Marcucci*, 299 F.3d at 1159).  That would contravene the grand jury's historic role of

5    protecting the innocent.  *See, e.g., United States v. Calandra*, 414 U.S. 338, 343 (1974) (The grand jury's

6    "responsibilities continue to include both the determination whether there is probable cause and the

7    protection of citizens against unfounded criminal prosecutions.") (citation omitted).

8         By the same token, if this Court said that "the case should move forward" if there is probable cause,

9    but intended to "leav[e] room for the grand jury to dismiss even if it finds probable cause," *see Navarro-*

10   *Vargas II*, 408 F.3d at 1205 (citing *Marcucci*, 299 F.3d at 1159), then it would have to have intended two

11   different meanings of the word "should" in the space of two consecutive sentences.  That could not have

12   been this Court's intent.  But even if it were, no grand jury could ever have had that understanding.  Jurors

13   are not presumed to be capable of sorting through internally contradictory instructions. *See generally United*

14   *States v. Lewis*, 67 F.3d 225, 234 (9th Cir. 1995) ("where two instructions conflict, a reviewing court cannot

15   presume that the jury followed the correct one") (citation, internal quotations and brackets omitted).

16   **C.    The Instructions Conflict With *Williams*' Holding that there Is No Duty to Present Exculpatory**
     **Evidence to the Grand Jury.**

17

18        In *Williams*, the defendant, although conceding that it was not required by the Fifth Amendment,

19   argued that the federal courts should exercise their supervisory power to order prosecutors to disclose

20   exculpatory evidence to grand jurors, or, perhaps, to find such disclosure required by Fifth Amendment

21   common law.  *See* 504 U.S. at 45, 51.  *Williams* held that "as a general matter at least, no such 'supervisory'

22   judicial authority exists." *See id.* at 47.  Indeed, although the supervisory power may provide the authority

23   "to dismiss an indictment because of misconduct before the grand jury, at least where that misconduct

24   amounts to a violation of one of those 'few, clear rules which were carefully drafted and approved by this

25   Court and by Congress to ensure the integrity of the grand jury's functions,'" *id.* at 46 (citation omitted), it

26   does not serve as "a means of *prescribing* such standards of prosecutorial conduct in the first instance." *Id.*

27   at 47 (emphasis added).  The federal courts possess only "very limited" power "to fashion, on their own

28   //

15

1  initiative, rules of grand jury procedure." *Id.* at 50.  As a consequence, *Williams* rejected the defendant's

2  claim, both as an exercise of supervisory power and as Fifth Amendment common law.  *See id.* at 51-55.

3         Despite the holding in *Williams*, the instructions here assure the grand jurors that prosecutors would

4  present to them evidence that tended to undercut probable cause.  *See Instructions* at 20.

5         Now, again, this emphasizes the difference between the function of the grand jury and the
6         trial jury.  You're all about probable cause.  If you think that there's evidence out there that
           might cause you say "well, I don't think probable cause exists," then it's incumbent upon you
7         to hear that evidence as well.  As I told you, in most instances, *the U.S. Attorneys are duty-
           bound to present evidence that cuts against what they may be asking you to do if they're
           aware of that evidence.*

8

9  *Id.* (emphasis added).  Moreover, this Court later returned to the notion of the prosecutors and their duties,

10 advising the grand jurors that they "can expect that the U.S. Attorneys that will appear in from of [them] will

11 be candid, they'll be honest, and ... they'll act in good faith in all matters presented to you."  *See id.* at 27.

12        This particular instruction has a devastating effect on the grand jury's protective powers, particularly

13 if it is not true.  It begins by emphasizing the message that *Navarro-Vargas II* somehow concluded was not

14 conveyed by the previous instruction: "You're all about probable cause."  *See id.* at 20.  Thus, once again,

15 the grand jury is reminded that they are limited to probable cause determinations.  The instruction goes on

16 to tell the grand jurors that they should consider evidence that undercuts probable cause, but also advises

17 the grand jurors that the prosecutor will present it.  The end result, then, is that grand jurors should consider

18 evidence that goes against probable cause, but, if none is presented by the government, they can presume

19 that there is none.  After all, "in most instances, the U.S. Attorneys are duty-bound to present evidence that

20 cuts against what they may be asking you to do if they're aware of that evidence."  *See id.*  Thus, if the

21 exculpatory evidence existed, it necessarily would have been presented by the "duty-bound" prosecutor,

22 because the grand jurors "can expect that the U.S. Attorneys that will appear in from of [them] will be

23 candid, they'll be honest, and ... they'll act in good faith in all matters presented to you."  *See id.* at 27.

24        These instructions create a presumption that, in cases where the prosecutor does not present

25 exculpatory evidence, no exculpatory evidence exists.  A grand juror's reasoning, in a case in which no

26 exculpatory evidence was presented, would proceed along these lines:

27        (1) I have to consider evidence that undercuts probable cause.
          (2)  The candid, honest, duty-bound prosecutor would, in good faith, have presented any such
28        evidence to me, if it existed.

(3)  Because no such evidence was presented to me, I may conclude that there is none.

Even if some exculpatory evidence were presented, a grand juror would necessarily presume that the

evidence presented represents the universe of all available exculpatory evidence; if there was more, the duty-

bound prosecutor would have presented it.

The instructions therefore discourage investigation -- if exculpatory evidence were out there, the

prosecutor would present it, so investigation is a waste of time -- and provide additional support to every

probable cause determination: i.e., this case may be weak, but I know that there is nothing on the other side

of the equation because it was not presented.  A grand jury so badly misguided is no grand jury at all under

the Fifth Amendment.

**D.**    **The Absolute Prohibition on Consideration of Penalty Information Violates *Vasquez*.**

The instructions advise the grand jurors that they are forbidden from considering the penalties to

which indicted persons may be subject.

> Prospective Juror (REA): ... And as far as being fair, it kind of depends on what the case is
> about because there is a disparity between state and federal law.
> The Court:  In what regard?
> Prospective Juror: Specifically, medical marijuana.
> The Court:  Well, those things -- the consequences of your determination shouldn't concern
> you in the sense that penalties or punishment, things like that -- *we tell trial jurors, of course,*
> *that they cannot consider the punishment or the consequence that Congress has set for these*
> *things.  We'd ask you to also abide by that.*  We want you to make a business-like decision
> of whether there was a probable cause. ...

*See Voir Dire* at 24-25 (emphasis added).  A "business-like decision of whether there was a probable cause"

would obviously leave no role for the consideration of penalty information.

The Ninth Circuit previously rejected a claim based upon the proscription against consideration of

penalty information based upon the same unlikely reading of the word "should" employed in *Marcucci*.  *See*

*Cortez-Rivera*, 454 F.3d at 1040-41.  *Cortez-Rivera* is inapposite for two reasons.  First, this Court did not

use the term "should" in the passage quoted above.  Second, that context, as well as this Court's consistent

use of a mandatory meaning in employing the term, eliminate the ambiguity (if there ever was any) relied

upon by *Cortez-Rivera*.  The instructions again violate *Vasquez*, which plainly authorized consideration of

penalty information.  *See* 474 U.S. at 263.

//

//

1  **E.      The Errors Are Structural.**

2         The errors here are constitutional: Mr. Urueta Herrejon is entitled to the "traditional functioning of

3  the institution that the Fifth Amendment demands," *see Williams*, 504 U.S. at 51, and the instructions do

4  not permit the grand jury to perform its function as is demonstrated by the instructions' many conflicts with

5  *Vasquez*.    That error is structural.    *See Navarros-Vargas*, 408 F.3d at 1214, 1216-17 (Hawkins, J.,

6  dissenting).  *Accord Navarros-Vargas*, 367 F.3d at 903 (Kozinski, J., dissenting).[4]  Nevertheless, even were

7  this Court restricted to exercising its supervisory powers, the decision to excuse at least two grand jurors

8  created the necessary prejudice to warrant dismissal.

9                                              **IV.**

10       **ALL EVIDENCE SHOULD BE SUPPRESSED BECAUSE IT WAS OBTAINED IN
         VIOLATION OF THE FOURTH AMENDMENT.**

11

12        The discovery in this case indicates that agents layed out a "spike strip" in front of the motor home,

13  which was traveling approximately fifty miles per hour.  This caused at least its front right tire to fail.  The

14  agents' sole grounds for suspicion before conducting this warrantless—and dangerous—arrest were that: (1)

15  an agent reported that a different type of vehicle -- a van rather than a motor home -- had been seen loading

16  in a group of people; (2) the motor home turned from Interstate 8 East onto Highway 98 and headed West;

17  and (3) the motor home was of a variety commonly used during that time of year by travelers, and therefore

18  suspicious by virtue of its ubiquity.

19        The agents used excessive force and seized the vehicle, thereby effecting an arrest instead of a stop.

20  Such an arrest requires probable cause, which the agents did not have.  In determining what use of force is

21  appropriate and reasonable within the meaning of the Fourth Amendment, the court must ask whether "there

22  was a safer way, given the time, place, and circumstances to stop the [ ] vehicle." *Scott v. Harris*, 127 S.Ct.

23  1769, 1779 (2007) (Ginsburg, J., concurring).  In the instant case, the agents' use of the spike strip was not

24  justified or reasonable under the circumstances, and was a complete seizure of the vehicle and arrest of its

25  //

26

27        [4]  Because the *Navarro-Vargas* majority found no error in the form instruction given, and not
    modified, in that case, the majority had no occasion to address the structural error analyses in Judge
28  Hawkins' and Judge Kozinski's dissents.  This Court may therefore rely upon them as the persuasive
    authority of six Ninth Circuit judges.

1  occupants, requiring probable cause. Even under the lower standard of reasonable suspicion, the

2  government's detention of Mr. Urueta Herrejon still fails.

3       Finally, rather than further investigate the situation after disabling the vehicle, Border Patrol Agent

4  Contreras immediately entered and searched the vehicle via the side door, despite the fact that he still lacked

5  probable cause. As a consequence of these three Fourth Amendment violations, all evidence and the fruits

6  of the unconstitutional arrest and search (*e.g.*, statements, all evidence) must be suppressed. *See Wong Sun*

7  *v. United States*, 371 U.S. 471 (1963); *see also United States v. Romero-Bustamante*, 337 F.3d 1104 (9th

8  Cir. 2003) (finding Fourth Amendment violation, suppressing alien material witnesses, and requiring

9  dismissal of indictment).

10  **A.    Border Patrol Agents Used Excessive Force to Stop the Vehicle, Effecting an Arrest Without**
    **Probable Cause.**

11

12       The manner in which Border Patrol Agents chose to seize Mr. Urueta Herrejon and the other

13  individuals in the car warranted a level of suspicion of at least probable cause. They did not have probable

14  cause when they arrested Mr. Urueta Herrejon by laying out a "spike strip" to stop him. "If the defendant

15  was arrested without probable cause, there is no need to determine whether an investigatory stop would have

16  been justified." *United States v. Patterson*, 648 F.2d 625, 632 (9th Cir. 1981) (citing *United States v.*

17  *Strickler*, 490 F.2d 378, 380 (9th Cir. 1974); *United States v. Ramos-Zaragoza*, 516 F.2d 141, 144 (9th Cir.

18  1975)). By employing the "spike strip," the agents bound themselves to the higher standard of probable

19  cause for the seizure they effected.

20       **1.    By employing the spike strip, agents arrested Mr. Urueta Herrejon**.

21       As the Ninth Circuit has observed, "[t]he line between an arrest without probable cause and an

22  investigatory stop based on founded suspicion is blurred and often difficult to determine[.]" *United States*

23  *v. Beck*, 598 F.2d 497, 500 (9th Cir. 1979). Although "a suspicious individual may be briefly stopped and

24  detained for purposes of limited inquiry . . . . the dimensions of an encounter between the individual and

25  officer may be sufficiently constrictive to cause the average person, innocent of crime, to reasonably think

26  he was being arrested." Id. (footnote omitted). In determining whether an arrest has occurred, "a significant

27  consideration is the extent that freedom of movement is curtailed." *Id.* at 500-01 (citing *Sibron v. New York*,

28  //

1    392 U.S. 40, 67 (1968)). "The other critical consideration is the degree and manner of force used in the stop

2    and detention." *Id.* at 501.

3        Agents arrested Mr. Urueta Herrejon when the "spike strip" they laid in front of the motor home

4    violently brought it to a sudden, involuntary stop.  At the moment the motor home ran over the spikestrip,

5    Mr. Urueta Herrejon's freedom of movement was seriously curtailed.  Suddenly, unexpectedly and without

6    warning, Mr. Urueta Herrejon went from moving down a highway at fifty miles per hour on four good tires

7    to having at least one of the tires of the motor home he was in blown out from underneath him.  After

8    coming to rest on the shoulder of Highway 98, Mr. Urueta Herrejon's freedom of movement had quickly

9    and drastically changed.  Had agents not found anything in the car, Mr. Urueta Herrejon would have been

10   stuck on Highway 98, roughly 10 miles from a town or city, and miles from any garage that could repair the

11   damage wrought by the agents.  This type of seizure, almost by definition, will always constitute an

12   abridgement of movement more similar to an arrest than an investigatory stop.  *Cf. Florida v. Royer*, 460

13   U.S. 491, 503 (1983) (fact that agents had control of an airline passenger's luggage and ticket eviscerated

14   consensual nature of earlier encounter between the passenger and agents, contributed to passenger being,

15   "[a]s a practical matter [] under arrest"); *United States v. Place*, 462 U.S. 696, 708 (1983) ("The person

16   whose luggage is detained is technically still free to continue his travels or carry out other personal activities

17   pending release of the luggage. . . . Nevertheless, such a seizure can effectively restrain the person since he

18   is subjected to the possible disruption of his travel plans in order to remain with his luggage or to arrange

19   for its return.").  A reasonable person, having had federal agents seriously damage their motor home in the

20   middle of the desert, would have reasonably believed he had been arrested by those agents.  *Cf. id.*  At a

21   minimum, under these circumstances, a reasonable person engaged in no illegality would not have felt free

22   to leave once he or she had answered the agent's initial questions—the damage done to the motor home

23   made leaving impossible.

24       The force used by agents would also cause a reasonable person in Mr. Urueta Herrejon's position

25   to believe he was under arrest.  *See Beck*, 598 F.2d at 501.  In fact, the recording of the agents' dispatch

26   communications does not appear to reflect a failure to yield.  *See* Ex. A at 1.  Blowing out a person's tires

27   as they drive down an interstate is a massive display of force and control.  A person subjected to such an

28   experience would not believe he was free to leave the scene until agents told him that he could.

1    By violently stopping Mr. Urueta Herrejon, agents effectuated an arrest. Because agents arrested Mr.

2    Urueta Herrejon when they "spike stripped" the motor home, the question becomes whether that arrest was

3    reasonable within the meaning of the Fourth Amendment. *See Beck v. Ohio*, 379 U.S. 89, 91 (1964).

4    Whether an arrest is "constitutionally valid depends in turn upon whether, at the moment the arrest was

5    made, the officers had probable cause to make it—whether at that moment the facts and circumstances

6    within their knowledge and of which they had reasonably trustworthy information were sufficient to warrant

7    a prudent man in believing that the petitioner had committed or was committing an offense." *Id.*

8    **2.    Agents did not have probable cause to arrest Mr. Urueta Herrejon**.

9    The circumstances known to agents when they arrested Mr. Urueta Herrejon were insufficient to

10    support a finding of probable cause. His arrest therefore violated the Fourth Amendment. *See Beck*, 598

11    F.2d at 502. As noted below, the facts indicated by the agents fall short of even reasonable suspicion. Thus

12    they can not rise to the level of probable cause necessary for the arrest of the eleven occupants of the vehicle,

13    including Mr. Urueta Herrejon. Where an arrest is effectuated without a warrant, as in this case, it must be

14    supported by probable cause. *United States v. Del Vizo*, 918 F.2d 821 (9th Cir. 1990). Probable cause exists

15    when an officer has "reasonably trustworthy information sufficient to warrant a prudent person in believing

16    that the accused had committed or was committing an offense." *United States v. Delgadillo-Velasquez*, 856

17    F.2d 1292, 1296 (9th Cir. 1988) (citations omitted). The facts indicated thus far are that an agent not present

18    at the arrest had seen a different type of vehicle loading in aliens; the motor home turned from one major

19    highway onto another major highway; and the vehicle was a motor home, which is common in the area

20    during the holiday season, and therefore conspicuously suspicious by virtue of its inconspicuousness.

21    **B.    There was no reasonable suspicion to stop the vehicle.**

22    Although the seizure of Mr. Urueta Herrejon and the motor home required probable cause, the agents

23    did not even have reasonable suspicion to stop the vehicle, because their articulable, objective facts about

24    the vehicle they actually stopped were based upon information from an agent who described seeing another

25    type of vehicle. The Fourth Amendment's prohibition of unreasonable searches and seizures extends to brief

26    investigatory stops of vehicles by roving border patrol agents. *United States v. Brignoni-Ponce*, 422 U.S.

27    873 (1975). An officer may not detain a motorist without "a particularized and objective bases for

28    suspecting *the particular person stopped* of criminal activity." *United States v. Cortez*, 449 U.S. 411,

1   417-418 (1981). (emphasis added).  This "objective basis, or 'reasonable suspicion' must consist of

2   'specific, articulable facts which, together with objective and reasonable inferences, form the basis for

3   suspecting that *the particular person detained* is engaged in criminal activity.'"  *United States v.*

4   *Garcia-Camacho*, 53 F.3d 244 (9th Cir. 1995) (citations omitted) (emphasis added); *accord United States*

5   *v. Sigmond-Ballesteros*, 285 F.3d 1117, 1120 (9th Cir. 2002) (finding that district court erred in finding that

6   vehicle stop was constitutional).

7         To constitute reasonable suspicion, the objective circumstances must demonstrate "a particularized

8   and objective basis for suspecting *the particular person stopped* of a criminal activity." *Cortez*, 449 U.S.

9   at 417-18 (emphasis added); *see also United States v. Berber-Tinoco*, 510 F.3d 1083, 1087 (9th Cir. 2007)

10  (citing Cortez).  The sum of articulable facts known to Agents Vega and Contreras, who together seized and

11  searched the motor home, were that (1) a "van-type vehicle" had been seen by other officers loading in what

12  appeared to be undocumented immigrants, (2) the motor home they were following turned from Interstate

13  8 onto Highway 98, and (3) motor homes are used by smugglers "during the holiday seasons to blend in with

14  winter visitors and recreational dune riders who typically travel in motor homes."  Even considered together,

15  the three grounds provided by the agents fail to articulate facts sufficient to constitute reasonable suspicion.

16        The first "suspicious" circumstance provided by the government is that agents had a second-hand

17  report of another agent who saw a group of people boarding a "van-type vehicle."  The vehicle they

18  debilitated by spike stripping and immediately searched was a motor home.  A motor home is neither a van

19  nor a van-type vehicle.  Thus, the description of a different type of vehicle was not an articulable fact giving

20  them reason to stop *this particular vehicle* driving down the highway.  Articulable suspicion is not the only

21  requirement when government officials conduct a *Terry* stop; the government intrusion of even a brief

22  detention requires that the suspicion be individualized *to them*.  *See Cortez*, 449 U.S. at 417-18.  Where

23  agents arrest a person in a different type of vehicle than that suspected by other agents, the suspicion is not

24  individualized to the person arrested.

25        The second "suspicious" circumstance was that the motor home turned from Interstate 8 East onto

26  Interstate 98.  Turning from one highway onto another is an accepted—and perfectly legal—driving

27  maneuver that allows a person to get from one place to another.  Here, for example, turning from Interstate

28  8 onto Interstate 98 would be the most reasonable means of returning to El Centro, California  if one had

just dropped off field workers in the early morning hours, or was returning from visiting a friend in the Eastern part of Date City.  The Ninth Circuit has warned against a finding of reasonable suspicion where the cited factors would sweep in "a very large category of presumably innocent travelers, who would be subject to virtually random seizures." *See Sigmond-Ballesteros*, 285 F.3d at 1127.  A turn from one highway onto another is precisely the kind of "articulable factor" that the Ninth Circuit has cautioned against weighing too heavily.  *See United States v. Manzo-Jurado*, 457 F.3d 928, 935 (9th Cir. 2006) ("to establish reasonable suspicion, an officer cannot rely solely on generalizations that, if accepted, would cast suspicion on large segments of the law abiding population").

Finally, the government appears to claim that the fact that the vehicle was a motor home supported reasonable suspicion.[5]  The discovery provided thus far contains the claim that in the agents' experience, "it is typical for smugglers/illegal traffickers to use this type of conveyance during the holiday seasons to blend in with winter visitors and recreational dune riders who typically travel in motor homes."  This reason falls flat. The Ninth Circuit has repeatedly rejected the "damned if you do, equally damned if you don't" approach to reasonable suspicion.  *United States v. Diaz Juarez*, 299 F.3d 1138, 1148 (9th Cir. 2002); *Sigmond-Ballesteros*, 285 F.3d at 1142; *United States v. Montero-Camargo*, 208 F.3d 1122, 1136 (9th Cir. 2000) (en banc).  *See also Garcia-Camacho*, 53 F.3d at 247; *United States v. Jimenez-Medina*, 173 F.3d 752, 755 (9th Cir. 1999).  In essence, the agent's claim amounts to the fact that the vehicle was one commonly on the road in that area at that time of year.  Precisely this type of factor sweeps too many members of society into its dragnet.  Any type of vehicle can be used for smuggling activities.  *See United States v. Rodriguez*, 976 F.2d 592, 596 (9th Cir. 1992) ("We may confidently assert that all types of vehicles have been used in smuggling operations at some place").  Particularly worrisome is a situation where agents claim that a variety of vehicle that is frequently on the road is suspicious, precisely for its lack of suspiciousness.

The court must look to the totality of the circumstances to determine whether there was reasonable suspicion to conduct an investigatory stop.  *United States v. Arvizu*, 534 U.S. 266 (2002).  The *Arvizu* case //

---

[5] Since officers were in fact looking for a "van-type vehicle," the fact that the vehicle was a motor home would of course undercut reasonable suspicion, rather than support it.

23

1   demonstrates how the totality of the circumstances can rise to the level of reasonable suspicion. 534 U.S.

2   at 277. In *Arvizu*, the agent articulated the following facts:

3    1.   a magnetic sensor alerted the agent to the presence of a vehicle on an unpaved,
          seldom traveled road used by smugglers to avoid Border Patrol checkpoints, *Arvizu*,
4         at 268;

     2.   the sensor alert occurred during a change in shifts which would leave the area
5         unpatrolled by the agents, *Id.*;

6    3.   the same sensor had detected a minivan using the same route several weeks before
          which resulted in a marijuana seizure, *Id.*, at 269-270;

7    4.   a second sensor signal indicated to the agent that the vehicle had turned onto another
          unpaved road on a route commonly used to circumvent checkpoints, *Id.*, at 270;

8    5.   when the agent intercepted the vehicle, it turned out to be a minivan, *Id.*;

     6.   when the agent followed the minivan, he noted that the occupants, who appeared to
9         be a family, behaved strangely, first ignoring him and then waving in a mechanical
          manner, *Id.*, at 270-271;

10   7.   the agent could see the children's knees, which indicated that their feet rested on
          some cargo. *Id.*, at 270;

11   8.   the van turned onto a third, even rougher unpaved road, away from any checkpoint,
          and away from any destination a family might want to reach for recreation, *Id.*, at
12        271; and

     9.   a radio check by the agent indicated that the minivan was registered to an address
13        four miles from the international border in a neighborhood notorious for smuggling
          activity, *Id.*, at 271.

14

15   As a result, the agent in *Arvizu* had reasonable suspicion to perform an investigatory stop of the

16   minivan because he could:

17       infer from his observations, his registration check, and his experience that ... [the minivan]
         had set out ... along a little-traveled route used by smugglers to avoid the ... checkpoint[s] ...
18       at a time when officers would be leaving their ... shifts ... on unpaved and primitive roads.

19   *Arvizu*, 534 U.S. at 277.

20       In this case, however, the facts set forth by the *three* Border Patrol agents who had an opportunity

21   to view the vehicle before stopping it are as follows:

22   1.   A van had been seen loading in undocumented aliens;

23   2.   The motor home turned from Interstate 8 to Highway 98; and,

24   3.   The motor home was a common vehicle in the area during the holiday season.

25       This is simply insufficient under the totality of the circumstances. A comparison between the facts

26   of *Arvizu* and the facts that form the particularized and objective basis for suspecting legal wrongdoing in

27   this case demonstrates that the agents had no reasonable suspicion to stop the motor home. In *Arvizu*, the

28   agent had nine independent, particularized, and objective facts that gave them particular suspicion of the

1   individuals in the vehicle. *See supra*. Thus, the Supreme Court found that the agent had a reasonable

2   suspicion that the occupants of the van were engaged in criminal activity. In the case at bar the agents can

3   muster not a single independent, objective fact that provides particularized suspicion of the motor home.

4   **C.    Border Patrol Agents Conducted a Search of the Vehicle Without Probable Cause**

5       The agents had insufficient evidence to conduct a warrantless, non-consensual search of the vehicle.

6   Accordingly, the Court must suppress the evidence seized pursuant to his unlawful search. Agent Contreras

7   immediately entered the side door of the motor home and searched the vehicle without a warrant. That

8   search is therefore presumptively unreasonable. *See United States v. Hawkins*, 249 F.3d 867, 872 (9th Cir.

9   2001). It is the government's burden to demonstrate that its agents complied with the Fourth Amendment.

10  *See id.* Here, the agents boldly entered the vehicle without a warrant, and without probable cause, after

11  effecting a violent stop of the vehicle and arresting all the occupants by debilitating their means of

12  transportation. For the same reasons they lacked probable cause to effect the arrest, they also lacked

13  probable cause to carry out the search without conducting any further investigation.

14  **V.**

15
16  **THIS COURT SHOULD SUPPRESS ANY STATEMENTS MADE BY MR. URUETA HERREJON BECAUSE THE GOVERNMENT CANNOT MEET ITS BURDEN TO PROVE A KNOWING AND INTELLIGENT WAIVER BECAUSE, INTER ALIA, IT PROVIDED A CONFUSING AMALGAM OF ADMINISTRATIVE AND *MIRANDA* WARNINGS, AND THE
17  INTERROGATOR EXACERBATED THE PROBLEM BY MISLEADINGLY SUGGESTING THAT MR. URUETA HERREJON WOULD BE RETURNED TO MEXICO.**

18

19  **A.    The Government Must Demonstrate Compliance With *Miranda*.**

20      **1.    *Miranda* Warnings Must Precede Custodial Interrogation.**

21      The prosecution may not use statements, whether exculpatory or inculpatory, stemming from a

22  custodial interrogation of the defendant unless it demonstrates the use of procedural safeguards effective to

23  secure the privilege against self-incrimination. *Miranda v. Arizona*, 384 U.S. 436, 444 (1966).[6]  The

24  prosecution may not use statements, whether exculpatory or inculpatory, stemming from a custodial

25  interrogation of the defendant unless it demonstrates the use of procedural safeguards effective to secure the

26

27      [6] In *Dickerson v. United States*, 530 U.S. 428 (2000), the Supreme Court held that *Miranda* rights
28  are no longer merely prophylactic, but are of constitutional dimension. *Id.* at 2336 ("we conclude that
    <u>Miranda</u> announced a constitutional rule").

privilege against self-incrimination. *Miranda*, 384 U.S. at 444. Custodial interrogation is questioning initiated by law enforcement officers after a person has been taken into custody or otherwise deprived of his freedom of action in any significant way. *Id. See Orozco v. Texas*, 394 U.S. 324, 327 (1969).

The warnings must advise the defendant of each of his "critical" rights. *United States v. Bland*, 908 F.2d 471, 474 (9th Cir. 1990). "In order for the warning to be valid, the combination or the wording of its warnings cannot be affirmatively misleading." *United States v. San Juan-Cruz*, 314 F.3d 384, 387 (9th Cir. 2003) (citing *United States v. Connell*, 869 F.2d 1349, 1352 (9th Cir. 1989)). "The warning must be clear and not susceptible to equivocation." *Id. See also id.* at 389-90 (vacating illegal entry conviction where defendant was advised of his administrative rights from an I-826 form and later advised of his *Miranda* rights).

**2.      The Ambiguity In the Purported *Miranda* Waiver Must Be Construed Against the Government Due to Its Heavy Burden to Demonstrate a Valid Waiver.**

The government, not the defense, bears the burden of proving a valid *Miranda* waiver.

> If the interrogation continues without the presence of an attorney and a statement is taken, *a heavy burden rests on the government* to demonstrate that the defendant knowingly and intelligently waived his privilege against self-incrimination and his right to retained or appointed counsel.

*Miranda*, 384 U.S. at 475 (citing *Escobedo v. Illinois*, 378 U.S. 478, 490 n. 14 (1963)) (emphasis added).[7]

The government's "heavy burden," <u>id.</u>, cannot be met absent evidence of proper warnings and a knowing and intelligent waiver.

> "Presuming a waiver from a silent record is impermissible. The record must show, or there must be an allegation *and* evidence which show, that an accused was offered counsel but intelligently and understandingly rejected the offer. Anything less is not a waiver."

*Id.* (quoting *Carnley v. Cochran*, 369 U.S. 506, 516 (1942)) (emphasis added). In short,

> [t]he warnings required and the waiver necessary in accordance with [the *Miranda*] opinion . . . are, in the absence of a fully effective equivalent, prerequisites to the admissibility of any statement made by a defendant.

---

[7] Although the burden is "heavy," the Ninth Circuit stated, in a post-*Dickerson* decision, that the government must carry its burden by a preponderance of the evidence. *See United States v. Crews*, 502 F.3d 1130, 1139-40 (9th Cir. 2007). *Crews* is wrongly decided. Because *Dickerson* holds that the warnings are constitutionally based, the Government bears the burden of demonstrating a *Miranda* waiver by clear and convincing evidence. *See Schell v. Witek*, 218 F.3d 1017, 1023 (9th Cir. 2000) (en banc) (constitutional rights may ordinarily be waived only if it can be established by clear and convincing evidence that the waiver is voluntary, knowing, and intelligent) (citations omitted).

*Id.* at 476.  As a consequence, "[t]here is a presumption against waiver." *United States v. Garibay*, 143 F.3d

534, 536 (9th Cir. 1998) (citations omitted).  *See also id.* at 537 ("the court will 'indulge every reasonable

presumption against waiver of fundamental constitutional rights.'") (quoting *United States v. Heldt*, 745 F.2d

1275, 1277 (9th Cir. 1986)).

The validity of a purported waiver depends "upon the particular facts and circumstances surrounding

that case, including the background, experience, and conduct of the accused." *Edwards v. Arizona*, 451 U.S.

477, 482 (1981) (internal quotations and citations omitted).  In *Derrick v. Peterson*, 924 F.2d 813 (9th Cir.

1990), the Ninth Circuit confirmed that the issue of the validity of a *Miranda* waiver requires a two prong

analysis:  the waiver must be both (1) voluntary, and (2) knowing and intelligent.  *Id.* at 820.  The

voluntariness prong of this analysis "is equivalent to the voluntariness inquiry under the [Fifth] Amendment

. . . ." *Id.*

The second prong, however, requiring that the waiver be "knowing and intelligent," mandates an

inquiry into whether "the waiver [was] made with a full awareness both of the nature of the right being

abandoned and the consequences of the decision to abandon it." *Id.* at 820-21 (quoting *Colorado v. Spring*,

479 U.S. 564, 573 (1987)).  This inquiry requires that the court determine whether "the requisite level of

comprehension" existed before the purported waiver may be upheld.  *Id.*  Thus, "[o]nly if the `totality of the

circumstances surrounding the interrogation' reveal *both* an uncoerced choice *and* the requisite level of

comprehension may a court properly conclude that the *Miranda* rights have been waived." *Id.* (quoting

*Colorado v. Spring*, 479 U.S. at 573) (emphasis in original) (citations omitted)).

To satisfy this burden, the prosecution must introduce evidence sufficient to establish "that under

the 'totality of the circumstances,' the defendant was aware of 'the nature of the right being abandoned and

the consequences of the decision to abandon it.'" *Garibay*, 143 F.3d at 536 (quoting *Moran v. Burbine*, 475

U.S. 412, 421 (1986)).  Thus, the requirement that any waiver be knowing and intelligent mandates an

inquiry into Mr. Urueta Herrejon's subjective understanding of the *Miranda* rights and the consequences of

forgoing them.

That inquiry cannot be conflated with the question of the voluntariness of any purported waiver.  The

requirement that any waiver be knowing and intelligent is completely distinct from the voluntariness

analysis: "police coercion is a necessary prerequisite to a determination that the waiver was involuntary [but

does] not bear[] on the separate question whether the waiver was knowing and intelligent." *United States v. Bradshaw*, 935 F.3d 295, 299 (D.C. Cir. 1991). *Accord United States v. Cristobal*, 293 F.3d 134, 142 (4th Cir. 2002) ("Because a waiver may very well have been voluntary (that is, uncoerced) and yet given without a knowing and intelligent waiver of *Miranda* rights, ..., it is not enough for us to find that Cristobal voluntarily waived his rights.") (citation omitted).

In addition to these general principles, the Ninth Circuit's case law plainly puts the onus on the government when it deals with suspects of limited education, and who lack familiarity with American culture, to explain rights with "thoroughness and clarity." *See United States v. Perez-Lopez*, 348 F.3d 839, 848 (9th Cir. 2003). *Accord San Juan-Cruz*, 348 F.3d at 389. In short, "*Miranda* ... requires 'meaningful advice to the unlettered and unlearned in language which [they] can comprehend and on which [they] can knowingly act.'" *Id.* (quoting *San Juan-Cruz*, 348 F.3d at 388) (brackets in original). As will be demonstrated below, the purported *Miranda* warnings and waiver here fall far short of that standard.

### 3. The Admonition Was Insufficient Because It Utterly Failed to Explain the Warnings In the Context of a Criminal Prosecution Rather Than Administrative Processing.

Here, as was the case in *San Juan Cruz*, Mr. Urueta Herrejon was first provided with administrative warnings. *See* Ex. B at 4.[8] Such warnings are normally associated with processing an alien for return to Mexico, an experience Mr. Urueta Herrejon has had three times. *See id.* at 5. Even so, F.S.O. Attiles, the interrogator, made no effort to explain the distinction between administrative and criminal proceedings, *see* Ex. A at 1, even though Agent Felix's report claims he did so. *See* Ex. B at 4. To make matters worse, when Mr. Urueta Herrejon inquired, during the purported waiver discussion, as to whether he would be deported as a driver, Attiles said "yes." *See* Ex. A at 1-2. Attiles' response, given to a man who had been returned to Mexico three times without prosecution, *see* Ex. B at 5, was plainly misleading.

Both *San Juan Cruz* and *Perez-Lopez* condemn warnings that contain a confusing amalgamation of administrative and criminal warnings. *See San Juan Cruz*, 314 F.3d at 388 ("Requiring someone to sort out such confusion is an unfair burden to impose on an individual already placed in a situation that is inherently stressful."). *Accord Perez-Lopez*, 348 F.3d at 848. Moreover, "thoroughness and clarity are especially

[8] Mr. Urueta Herrejon cannot, at this point, challenge the contents of the warnings themselves as his counsel does not yet have a translation of them.

1   important when communicating with uneducated defendants." *See Perez-Lopez*, 348 F.3d at 848.  Attiles'

2   comments were neither thorough nor clear, a flaw that was exacerbated by his failure to provide any

3   meaningful explanation when Mr. Urueta Herrejon asked whether the driver would be deported.  Attiles

4   merely said "yes," not "yes, but only after you serve any sentence you receive if you are convicted."  In short,

5   the *Miranda* procedure here requires suppression because it was "affirmatively misleading."  *See San Juan*

6   *Cruz*, 314 F.3d at 387.  *Accord Perez-Lopez*, 348 F.3d at 848.

7   **B.     Any Statements by Mr. Urueta Herrejon Were Involuntary.**

8            Even when the procedural safeguards of *Miranda* have been satisfied, a defendant in a criminal case

9   is deprived of due process of law if the conviction is founded upon an involuntary confession.  *Arizona v.*

10  *Fulminante*, 499 U.S. 279 (1991); *Jackson v. Denno*, 378 U.S. 368, 387 (1964).  *See also* 18 U.S.C. § 3501.

11  The government bears the burden of proving by a preponderance of the evidence that a confession is

12  voluntary.  *Lego v. Twomey*, 404 U.S. 477, 483 (1972).

13           In order to be voluntary, a statement must be the product of a rational intellect and free will.

14  *Blackburn v. Alabama*, 361 U.S. 199, 208 (1960).  In determining whether a defendant's will was overborne

15  in a particular case, the totality of the circumstances must be considered.  *Schneckloth v. Bustamonte*, 412

16  U.S. 218, 226 (1973).  Some factors taken into account have included the youth of the accused, his lack of

17  education, his low intelligence, the lack of any advice to the accused of his constitutional rights, the length

18  of the detention, the repeated and prolonged nature of the questioning, and the use of physical punishment

19  such as the deprivation of food or sleep.  *Id.*

20           A confession is deemed involuntary whether coerced by physical intimidation or psychological

21  pressure.  *Townsend v. Sain*, 372 U.S. 293, 307 (1962).  "The test is whether the confession was `extracted

22  by any sort of threats or violence, [or] obtained by any direct or implied promises, however slight, [or] by

23  the exertion of any improper influence.'"  *See Hutto v. Ross*, 429 U.S. 28, 30 (1976) (quoting *Bram v. United*

24  *States*, 168 U.S. 532, 542-43 (1897)).  *Accord United States v. Tingle*, 658 F.2d 1332, 1335 (9th Cir. 1981).

25  Here, Attiles' misleading response to Mr. Urueta Herrejon's query as to whether drivers are deported,

26  qualifies as an implied promise.  Only after he was led to believe that he would be returned to Mexico did

27  Mr. Urueta Herrejon agree to speak.

28  *//*

29

1   Until the government meets its burden of showing all statements of the defendant that it intends to

2   use at trial were voluntary, all statements -- even those taken before he was in "custody" -- must be

3   suppressed as involuntary.

4   **C.    Mr. Urueta Herrejon Requests That This Court Conduct An Evidentiary Hearing.**

5       This Court must make a factual determination as to whether a confession was voluntarily given prior

6   to its admission into evidence. *See Lego v. Twomey*, 404 U.S. at 483; 18 U.S.C. § 3501(a).  Where a factual

7   determination is required, courts are obligated by Fed. R. Crim. P. 12 to make factual findings.  *See*

8   *United States v. Prieto-Villa*, 910 F.2d 601, 606-10 (9th Cir. 1990).  Because "'suppression hearings are

9   often as important as the trial itself,'" id. at 609-10 (quoting *Waller v. Georgia*, 467 U.S. 39, 46 (1984)),

10  these findings should be supported by evidence, not merely an unsubstantiated recitation of purported

11  evidence in a prosecutor's responsive pleading.[9]

12      Under section 3501(b), this Court must consider various enumerated factors in making the

13  voluntariness determination, including whether the defendant understood the nature of the charges against

14  him and whether he understood his rights.  Without the presentation of evidence, this Court cannot

15  adequately consider these statutorily mandated factors. Mr. Urueta Herrejon accordingly requests that this

16  Court conduct an evidentiary hearing pursuant to 18 U.S.C. § 3501(a), to determine, outside the presence

17  of the jury, whether any statements made by him were voluntary.

18                                              **VI.**

19  **THE IDENTIFICATION TESTIMONY SHOULD BE SUPPRESSED DUE THE HIGHLY
    SUGGESTIVE ADMINISTRATION OF THE PHOTOGRAPHIC LINEUP.**

20

21      Here, the government has obtained pretrial identification of Mr. Urueta Herrejon by three material

22  witnesses,  Israel Salmeron, Zenai Salmeron, and Bogar Paul Mendez-Palomino (listed in the indictment as

23  Bogar Paul-Mendez).  The material witnesses were present in the van, and at Mr. Urueta Herrejon's arrest.

24  Because Mr. Urueta Herrejon was arrested and separated from the rest of the group, there was inherent

25  _____

26      [9]   An evidentiary hearing is the only way to assure that there is a complete and impartial
    determination of whether the defendant knowingly and voluntarily waived his rights.  Surely, this Court
27  would not rely on the unsworn assertions of the *opposing* party in determining whether the waiver of the
    Sixth Amendment right to counsel was knowing and voluntary.  The waiver of important rights guaranteed
28  by the Fifth Amendment should be no different.

                                                30

1    prejudice from the very beginning of the investigation: a witness was likely to recognize him as the person

2    separated, regardless of whether he was the driver.

3        The potential for prejudice was exacerbated by the mishandling of the identification process.  Rather

4    than provide a neutral admonition -- i.e., "there may or may not be a suspect in the array" -- the material

5    witnesses were asked *to identify the driver from the photographs*.  *See* Ex. A at 2.  The obvious implication

6    of that statement is that the driver is depicted in one of the photographs, thus encouraging an identification

7    of any person that the witness recognized, whether that person was the driver or not.[10]

8        Identification testimony obtained by unduly suggestive procedures violates a defendant's right to due

9    process because it may lead to an irreparably mistaken identification.  *Stovall v. Denno*, 388 U.S. 293, 301-

10    01 (1967); *Neil v. Biggers*, 409 U.S. 188, 196 (1972); *Blanco v. Singletary*, 943 F.2d 1477, 1508 (11th Cir.

11    1991).  A suggestive pre-trial identification may so taint subsequent out-of-court and in-court identifications

12    that an accused is denied due process of law if the witness is permitted to make the in-court identification.

13    *See United States v. Love*, 746 F.2d 477, 478 (9th Cir. 1984).  Once a procedure is established as

14    impermissibly suggestive, the reliability of the subsequent in-court identification of evidence must be

15    analyzed by weighing the indicia of reliability against the indicia of improper influence, that is "the

16    corrupting tendencies of a suggestive pre-trial identification procedure."  *United States v. Field*, 625 F.2d

17    862, 867 (9th Cir. 1980).  The Ninth Circuit has held that "[c]onvictions based on in-court identifications

18    following a pre-trial identification by photograph will be set aside where the photographic identification

19    procedure was so impermissibly suggestive as to give rise to a substantial likelihood of misidentification."

20    *United States v. Barrett*, 703 F.2d 1076, 1084 (9th Cir. 1983).

21        The Supreme Court has recognized that "improper employment of photographs may sometimes cause

22    witnesses to err in identifying criminals."  *Simmons v. United States*, 390 U.S. 377, 383 (1968).  "An

23    otherwise fair pretrial identification procedure may be rendered impermissibly suggestive through

24    subsequent actions or remarks by government agents."  *United States v. Thai*, 29 F.3d 785, 810 (2d Cir.

25    1994) (citation omitted).   Conduct less egregious than that undertaken here has been held to be

26    impermissibly suggestive.  *See, e.g., United States v. Wiseman*, 172 F.3d 1196, 1209 (10th Cir. 1999)

27

28        [10]    Because the government has not produced the photographic lineup that it employed, the instant
motion does not address the array.

("[S]ome of the witnesses were told that a suspect had been arrested. We have previously noted that imparting this information is highly suggestive.") (citing *Grubbs v. Hannigan*, 982 F.2d 1483, 1490 (10th Cir. 1993)) (footnote omitted).[11] *Compare Simmons*, 390 U.S. at 385 ("There is no evidence to indicate that the witnesses were told anything about the progress of the investigation, or that the FBI agents in any other way suggested which persons in the pictures were under investigation.") If it is "highly suggestive" merely to indicate that there is a suspect -- a status that connotes an incomplete investigation -- it is far more suggestive to assert that there is no doubt: one of the persons depicted *is* the driver.

In *United States v. Saunders*, 501 F.3d 384 (4th Cir. 2007), the Fourth Circuit was confronted with a photographic array that was itself suggestive *and* the police officers' failure to advise the witness, as required by internal procedures, "that the array may not contain a photo of the person under investigation." *See id.* at 388. The police had told the witness "that they had arrested one or more suspects in the robbery." *See id.* at 391. The *Saunders* court recognized that this information could taint the identification process.

> Imparting this information to the witness *can lead him to assume* that a photo of the arrested person will be in the array. The witness, moreover, can feel pressure to make an identification, even if he is not fully confident, for fear of jeopardizing the case against the arrested suspect.

*Id.* (emphasis added). Thus, the possibility of an assumption by the witness was the danger identified in *Saunders*. Indeed, it is well-established that the failure to give cautionary instructions and failure to observe other procedural safeguards regarding eyewitnesses prior to showing photos is considered bad police practice and runs a dangerous risk of misidentification. *See* Cutler & Penrod, *Mistaken Identification* 115-120 (1995).

---

[11] *Accord* Gary L. Wells & Eric P. Seelau, *Eyewitness Identification: Psychological Research and Legal Policy On Lineups*, 1 Psychol. Pub. Pol'y & L. 765, 769 (1995); *id.* at 778-79 ("Eyewitnesses should be told explicitly that the person in question might not be in the lineup or photospread and, therefore [the eyewitnesses] should not feel that they must make an identification."). Wells and Seelau point to research that demonstrates that an instruction that perpetrator "'might or might not be present'" significantly increased the likelihood of accurate identification in a "staged crime" experiment. *See id.* "Not warning the eyewitness that the culprit might not be in the lineup resulted in 78% of the eyewitnesses attempting an identification from the culprit-absent lineup. This false identification rate dropped to 33% when the eyewitnesses were explicitly warned that the culprit might not be in the lineup." *Id.* The results would likely be even more stark in an experiment in which the agents' misconduct in the instant case were reproduced because here the eyewitnesses were effectively assured that the driver was in the lineup, rather than merely omitting to tell them that he might not be.

Nor is the danger of the suggestive of the procedures ameliorated by detailed descriptions given by the material witnesses.  Counsel is aware of no evidence of such descriptions.  *See generally Garvey v. Duncan*, 485 F.3d 709, 727-29 (2d Cir. 2007) (Straub, J., dissenting) (arguing the significance of a witness's failure to provide a description and collecting cases).  In short, the dangers identified in *Saunders* have not been mitigated.

The procedure here therefore "was so impermissibly suggestive as to give rise to a very substantial likelihood of irreparable misidentification."  *Simmons*, 390 U.S. at 384.  Misidentification is prejudicial because "the witness thereafter is apt to retain in his memory the image of the photograph rather than of the person actually seen, reducing the trustworthiness of subsequent ... courtroom identifications."  *Id.* at 383-84. Here, the courtroom testimony is tainted by the agents' misconduct, and the government cannot demonstrate that the identifications are nonetheless reliable.

**VII.**

**MOTION FOR LEAVE TO FILE ADDITIONAL MOTIONS**

Mr. Urueta Herrejon has received 61 pages of discovery, a dvd and a compact disc.  As information comes to light, due to the government providing additional discovery in response to these motions or an order of this Court, Mr. Urueta Herrejon may find it necessary to file further motions.  It is, therefore, requested that Mr. Urueta Herrejon be allowed the opportunity to file further motions based upon information gained through the discovery process.

**VIII.**

**CONCLUSION**

For the foregoing reasons, Mr. Urueta Herrejon respectfully requests that the Court grant the above motions.

Respectfully submitted,

Dated: March 24, 2008                                  /s/ Steven F. Hubachek
                                                       **STEVEN F. HUBACHEK**
                                                       **DAVID M.C. PETERSON**
                                                       Federal Defenders of San Diego, Inc.
                                                       Attorneys for Defendant
                                                       Steven_Hubachek@fd.org