KAREN P. HEWITT
United States Attorney
REBECCA S. KANTER
Assistant U.S. Attorney
California State Bar No. 230257
United States Attorney's Office
880 Front Street, Room 6293
San Diego, California 92101-8893
Phone: (619) 557-6747
Fax: (619) 235-2757
E-mail: rebecca.kanter@usdoj.gov


Attorneys for Plaintiff
United States of America

UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | Criminal Case No. 08cr0549-LAB |
| | ) | |
| Plaintiff, | ) | **RESPONSE AND OPPOSITION TO** |
| | ) | **DEFENDANT'S MOTIONS:** |
| v. | ) | |
| | ) | (1)  TO COMPEL DISCOVERY |
| SERGIO URUETA-HERREJON, | ) | (2)  PRESERVE EVIDENCE |
| | ) | (3)  DISMISS THE INDICTMENT DUE TO |
| Defendant. | ) | MISINSTRUCTION OF THE GRAND JURY |
| | ) | (4)  SUPPRESS EVIDENCE |
| | ) | (5)  SUPPRESS STATEMENTS |
| | ) | (6)  SUPPRESS TESTIMONY |
| | ) | (7)  TO FILE FURTHER MOTIONS |
| | ) | |
| | ) | Date:    April 14, 2008 |
| | ) | Time:    2:00 p.m. |
| | ) | Court:   The Hon.  Larry A.  Burns |
| | ) | |

COMES NOW the plaintiff, UNITED STATES OF AMERICA, by and through its counsel, United States Attorney, Karen P. Hewitt, and Assistant U.S. Attorney Rebecca S. Kanter, and hereby files its Response and Opposition to Defendant's Motions to Compel Discovery, Preserve Evidence, Dismiss Indictment Due to Improper Grand Jury Instruction, Suppress Statements, Suppress Testimoy, and Grant leave to File Further Motions.  This Response and Opposition is based upon the files and records of this case, together with the attached Statement of Facts and Memorandum of Points and Authorities.

**I**

## STATEMENT OF FACTS

**A.    Defendant's Apprehension**

On February 17, 2008, at approximately 5:10 a.m., Border Patrol Agents Jorge Vega-Torres and Marla Soto followed a group of ten suspected illegal aliens who had crossed illegally into the United States approximately 17 miles east of Calexico, California. Agent Vega-Torres contacted the Remote Video Surveillance Operator ("RVSS") at Calexico, California, to request assistance in identifying the group's precise location north of their position. At approximately 5:25 a.m., the RVSS operator advised Agent Vega-Torres that he could see the group of individuals just south of Interstate 8 where they appeared to be waiting for something. The RVSS operator then advised Agent Vega-Torres that a van-like vehicle had pulled over to the shoulder of I-8 and picked up the group of individuals. Because of its close proximity to the border in that area, I-8 is a commonly used route for alien smuggling activity.

The RVSS operator maintained surveillance on the vehicle as it traveled eastbound on I-8 towards the intersection of I-8 and Highway-98 ("East Y"). Border Patrol Agent Francisco Contreras was performing duties at the westbound I-8 checkpoint, one mile east of the East Y. He observed a solitary vehicle approach his location and confirmed with the RVSS operator that the vehicle was the same van-like vehicle the RVSS operator saw load the individuals. Agent Contreras informed Agent Vega-Torres and other agents in the area that the van-like vehicle was in fact a motor-home. The motor-home exited I-8 and entered Hwy-98 heading westbound, i.e. the opposite direction. Agents continued to monitor the motor-home because (1) the area is commonly used for alien smuggling activities, (2) the agents had seen a group of people hike through the brush and get into the motor-home on the side of I-8, (3) it was the only vehicle present in the early morning hours along I-8, and (4) agents' past experience is that alien smugglers typically use large recreational types of vehicles, especially during the winter months and on holiday weekends to blend in with visitors and recreational travelers.

Agent Contreras attempted to conduct a vehicle stop. The vehicle failed to yield to Agent Contreras's emergency lights and siren. Agent Contreras moved back and forth across the lane behind the motor-home in order to ensure that the driver of the motor-home could see the emergency lights and effectuate the stop. Agent Contreras informed Agent Vega-Torres that the vehicle was failing to yield. Agent Vega-Torres, with permission from Supervisory Agent Alexander Mills, deployed the controlled

1    tire deflation device ("CTDD"), successfully deflating the front passenger tire.

2        The motor-home began to slow down and eventually came to a complete stop on the north

3    shoulder of the highway.  Agent Contreras opened the passenger side door and observed eleven (11)

4    individuals lying on the floor.  Agent Contreras identified himself as a United States Border Patrol

5    Agent and questioned the individuals as to their immigration status.  All individuals indicated that they

6    are citizens of Mexico with no legal right to enter or remain in the United States.  The person closest

7    to the drivers seat, later identified as Sergio Urueta-Herrejon, was the only individual wearing clean,

8    dry clothes.  All the other ten individuals had mud on their shoes and wet pants from crossing the All

9    American Canal.  All individuals were transported to the Calexico, California Border Patrol Station for

10   further processing.

11   **B.    Defendant's Post-Arrest Statements**

12       At approximately 8:06 a.m., Defendant was read his Miranda rights by Field Operations

13   Supervisor Nelson Atiles.  *See* Exh.  A.  He agreed to waive those rights and speak to agents without

14   a lawyer.  Defendant admitted to being a citizen of Mexico born in Morelia, Michoacan on October 4,

15   1982. He claimed he crossed into the United States illegally approximately 10 days before.  He claimed

16   he was driving the vehicle with illegal aliens as a favor to the individuals who had illegally crossed him

17   into the United States.

18   **C.    Material Witness Statements**

19       Three material witnesses – Zenai Salmeron-Valle, Israel Salmeron-Valle, and Bogar Paul

20   Mendez-Palomino – were interviewed.  *See* Exh.  B-D.  All three admitted to being citizens and

21   nationals of Mexico.  All three identified Defendant in a photographic line-up as the individual who

22   picked them up after they crossed the border and drove the vehicle.

23                                                    **II.**

24   **DEFENDANT'S MOTIONS TO COMPEL DISCOVERY AND PRESERVE EVIDENCE**

25       On February 21, 2008, the Government produced 61pages of discovery to Defendant which

26   included the reports from the Border Patrol Agents and summaries of the statements made by Defendant.

27    On March 13, 2008, the Government produced DVD recordings of the interviews of Defendant and the

28   material witnesses.  On March 20, 2008, the Government produced the dispatch tapes related to

1    Defendant's failure-to-yield to agents.  Finally, on April 4, 2008, the Government produced copies of

2    the photographic line-up.

3    **(1)    Defendant's Statements**

4         The Government recognizes its obligation, under Rules 16(a)(1)(A) and 16(a)(1)(B), to provide

5    to Defendant the substance of Defendant's oral statements and written statements.  (Unless otherwise

6    noted, all references to "Rules" refers to the Federal Rules of Criminal Procedure.)  The Government

7    has produced all of the Defendant's statements that are known to the undersigned Assistant U.S.

8    Attorney at this date.  If the Government discovers additional oral or written statements that require

9    disclosure under Rule 16(a)(1)(A) or Rule 16(a)(1)(B), such statements will be promptly provided.

10   **(2)    Arrest Reports, Notes, and Dispatch Tapes**

11        The Government has provided Defendant with all known reports related to Defendant's arrest

12   in this case.  The Government is not aware at this time of the existence of any dispatch tapes relevant

13   to this case, but will attempt to determine whether any such tapes exist.  The Government will continue

14   to comply with its obligation to provide to Defendant all reports subject to Rule 16(a)(1)(A).  The

15   Government has no objection to the preservation of the agents' handwritten notes.  See United States

16   v. Harris, 543 F.2d 1247, 1253 (9th Cir. 1976) (agents must preserve their original notes of interviews

17   of an accused or prospective government witnesses).

18        However, the Government objects to providing Defendant with a copy of the rough notes at this

19   time.  The Government is not required to produce the notes pursuant to the Jencks Act because the notes

20   do not constitute "statements" (as defined 18 U.S.C. § 3500(e)) unless the notes (1) comprise both a

21   substantially verbatim narrative of a witness' assertion, and (2) have been approved or adopted by the

22   witness.  United States v. Spencer, 618 F.2d 605, 606-07 (9th Cir. 1980).  The notes are not Brady

23   material because, as discussed further, the notes do not present any material exculpatory information

24   or any evidence favorable to Defendant that is material to guilt or punishment.  If, during a future

25   evidentiary hearing, certain rough notes become particularly relevant, the notes in question will be made

26   available to Defendant.

27   **(3)    Brady Material**

28        The Government will perform its duty under Brady v. Maryland, 373 U.S. 83 (1963) to disclose

4

material exculpatory information or evidence favorable to Defendant when such evidence is material to guilt or punishment.   The Government recognizes that its obligation under Brady covers not only exculpatory evidence, but also evidence that could be used to impeach witnesses who testify on behalf of the United States.  See Giglio v. United States, 405 U.S. 150, 154 (1972); United States v. Bagley, 473 U.S. 667, 676-77 (1985).  This obligation also extends to evidence that was not requested by the defense.  Bagley, 473 U.S. at 682; United States v. Agurs, 427 U.S. 97, 107-10 (1976).  "Evidence is material, and must be disclosed (pursuant to Brady), 'if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different.'" Carriger v. Stewart, 132 F.3d 463, 479 (9th Cir. 1997) (en banc).  The final determination of materiality is based on the "suppressed evidence considered collectively, not item by item." Kyles v. Whitley, 514 U.S. 419, 436-37 (1995).

Brady does not, however, mandate that the Government open all of its files for discovery.  See United States v. Henke, 222 F.3d 633, 642-44 (9th Cir. 2000) (per curiam).  Under Brady, the United States is not required to provide: (1) neutral, irrelevant, speculative, or inculpatory evidence (see United States v. Smith, 282 F.3d 758, 770 (9th Cir. 2002)); (2) evidence available to the defendant from other sources (see United States v. Bracy, 67 F.3d 1421, 1428-29 (9th Cir. 1995)); (3) evidence that the defendant already possesses (see United States v. Mikaelian, 168 F.3d 380-389-90 (9th Cir. 1999) amended by 180 F.3d 1091 (9th Cir. 1999)); or (4) evidence that the undersigned Assistant U.S. Attorney could not reasonably be imputed to have knowledge or control over.  See United States v. Hanson, 262 F.3d 1217, 1234-35 (11th Cir. 2001).    Brady does not require the Government "to create exculpatory evidence that does not exist," United States v. Sukumolahan, 610 F.2d 685, 687 (9th Cir. 1980), but only requires that it "supply a defendant with exculpatory information of which it is aware." United States v. Flores, 540 F.2d 432, 438 (9th Cir. 1976).

**(4)**    **Information That May Result in a Lower Sentence**

The Government has provided and will continue to provide Defendant with all Brady material that may result in mitigation of Defendant's sentence.  Nevertheless, the Government is not required to provide information bearing on Defendant's sentence until after Defendant's conviction or guilty plea and prior to her sentencing date.  See United States v. Juvenile Male, 864 F.2d 641, 647 (9th Cir. 1988)

5

1   (no <u>Brady</u> violation occurs "if the evidence is disclosed to the defendant at a time when the disclosure

2   remains in value").

3   **(5)      Defendant's Prior Record**

4          The Government has provided Defendant with all known documentation regarding his prior

5   criminal record and thereby fulfilled its duty of discovery under Rule 16(a)(1)(D).  <u>See</u> <u>United States</u>

6   <u>v. Audelo-Sanchez</u>, 923 F.2d 129 (9th Cir. 1990).  To the extent that the Government determines that

7   there are any additional documents reflecting Defendant's prior criminal record, the Government will

8   provide those to Defendant.

9   **(6)      Any Proposed 404(b) Evidence**

10          The Government will disclose in advance of trial the general nature of any "other bad acts"

11  evidence that the United States intends to introduce at trial pursuant to Fed. R. Evid. 404(b).  Evidence

12  should not be treated as "other bad acts" evidence under Fed. R. Evid. 404(b) when the evidence

13  concerning the other bad acts and the evidence concerning the crime charged are "inextricably

14  intertwined."  <u>United States v. Soliman</u>, 812 F.2d 277, 279 (9th Cir. 1987).

15  **(7)      Evidence Seized**

16          The Government has complied and will continue to comply with Rule 16(a)(1)(E)[1] in allowing

17  Defendant an opportunity, upon reasonable notice, to examine, inspect, and copy all evidence seized

18  that is within its possession, custody, or control, and that is either material to the preparation of

19  Defendant's defense, or is intended for use by the Government as evidence during its case-in-chief at

20  trial, or was obtained from or belongs to Defendant.

21  **(8)      Request for Preservation of Evidence**

22          The Constitution requires the Government to preserve evidence "that might be expected to play

23  a significant role in the suspect's defense."  <u>California v. Trombetta</u>, 467 U.S. 479, 488 (1984).  To

24  require preservation by the Government, such evidence must (1) "possess an exculpatory value that was

25  apparent before the evidence was destroyed," and (2) "be of such a nature that the defendant would be

26

27  _____

28          [1]      Defendant requests production of evidence seized pursuant to Rule 16(a)(1)(C). Because Rule 16(a)(1)(C) deals with "organizational defendants," the Government interprets this as a request under Rule 16(a)(1)(E).

1   unable to obtain comparable evidence by other reasonably available means." Id. at 489; see also Cooper

2   v. Calderon, 255 F.3d 1104, 1113-14 (9th Cir. 2001). The Government has made every effort to

3   preserve evidence it deems to be relevant and material to this case, including sending a letter to the

4   agency in charge on January 16, 2008, requesting the specific preservation of evidence. Any failure to

5   gather and preserve evidence, however, would not violate due process absent bad faith by the

6   Government that results in actual prejudice to the Defendant. See Illinois v. Fisher, 540 U.S.1174, 124

7   S.Ct. 1200 (2004) (per curiam); Arizona v. Youngblood, 488 U.S. 51, 57-58 (1988); United States v.

8   Rivera-Relle, 322 F.3d 670 (9th Cir. 2003); Downs v. Hoyt, 232 F.3d 1031, 1037-38 (9th Cir. 2000).

9   **(9)     Documents and Tangible Objects**

10      The Government has complied and will continue to comply with Rule 16(a)(1)(E)[2] in allowing

11   Defendant an opportunity, upon reasonable notice, to examine, inspect, and copy documents and

12   tangible objects that are within its possession, custody, or control, and that is either material to the

13   preparation of Defendant's defense, or is intended for use by the Government as evidence during its

14   case-in-chief at trial, or was obtained from or belongs to Defendant, including Defendant's A-file. The

15   Government need not, however, produce rebuttal evidence in advance of trial. United States v. Givens,

16   767 F.2d 574, 584 (9th Cir. 1984).

17   **(10)    Expert Witness**

18      Prior to the time of trial, the Government will give the requisite notice and provide discovery

19   regarding any expert witness anticipated to be used at trial pursuant to Fed. R. Crim. P. 16(a)(1)(G).[3]

20   **(11)    Evidence of Bias or Motive to Lie**

21      The Government recognizes its obligation under Brady and Giglio to provide evidence that could

22   be used to impeach Government witnesses including material information regarding demonstrable bias

23   or motive to lie. The Government is not aware of any evidence of any bias or motivation to lie on the

24

25

26   [2]     Defendant requests the opportunity to inspect tangible objects pursuant to Rule 16(a)(1)(C). Again, because Rule 16(a)(1)(C) deals with "organizational defendants," the Government interprets this as a request under Rule 16(a)(1)(E).

27

28   [3]     Defendant requests expert witness notice pursuant to Rule 16(a)(1)(E). Because Rule 16(a)(1)(E) addresses documents and objects, the Government interprets this as a request under Rule 16(a)(1)(G).

part of prospective government witnesses.  If the Government discovers the existence of information related to a government witness's bias or motive to lie, the information will be provided to the Defendant.

**(12)**    **Impeachment Evidence**

As discussed elsewhere, the Government recognizes its obligation under <u>Brady</u> and <u>Giglio</u> to provide material evidence that could be used to impeach Government witnesses.

**(13)**    **Evidence of Criminal Investigation of Any Government Witness**

Defendant is not entitled to any evidence that a prospective witness is under criminal investigation by federal, state, or local authorities.  The Government is under no obligation to turn over the criminal records or rap sheet of its potential witnesses.  <u>United States v. Taylor</u>, 542 F.2d 1023, 1026 (8th Cir. 1976).  The Government will, however, provide the conviction record, if any, which could be used to impeach witnesses the United States intends to call in its case-in-chief.

**(14)**    **Evidence Affecting Perception, Recollection, Ability to Communicate, or Truth Telling**

The Government recognizes its obligation under <u>Brady</u> and <u>Giglio</u> to provide material evidence that could be used to impeach Government witnesses including material information related to perception, recollection, ability to communicate, or truth telling.  The Government strenuously objects to providing any evidence that a witness has ever used narcotics or other controlled substance, or has ever been an alcoholic because such information is not discoverable under Rule 16, <u>Brady</u>, <u>Giglio</u>, <u>Henthorn</u>, or any other Constitutional or statutory disclosure provision.

**(15)**    **Witness Addresses**

The Government has provide Defendant with the reports containing the names, work addresses, and telephone numbers of the inspectors, officers and special agents who asked questions of Defendant and were witnesses to the event.  In its trial memorandum, the Government will provide Defendant with a list of all witnesses whom it intends to call in its case-in-chief, although delivery of such a witness list is not required.  <u>See</u> <u>United States v. Discher</u>, 960 F.2d 870 (9th Cir. 1992); <u>United States v. Mills</u>, 810 F.2d 907, 910 (9th Cir. 1987).  The Government strenuously objects to providing the home addresses or the home or personal cellular telephone numbers to Defendant.  In non-capital cases, the Government is not even required to disclose the names of its witnesses prior to trial.  <u>United States v. Dishner</u>, 974

8

F.2d 1502, 1522 (9th Cir 1992); (<u>citing</u> <u>United States v. Steel</u>, 759 F.2d 706, 709 (9th Cir. 1985));

<u>United States v. Hicks</u>, 103 F.23d 837, 841 (9th Cir. 1996); <u>see also</u> <u>United States v. Bejasa</u>, 904 F.2d

137 (2d Cir. 1990) (holding that United States did not improperly deny defendant access to government

witnesses whose telephone numbers and addresses the government refused to provide because defendant

knew the identities of the government witnesses and presumably knew their telephone numbers or could

have contacted them through the exercise of due diligence).

**(16)     Name of Witnesses Favorable to the Defendant**

The Government is not aware of the names of any witnesses favorable to the Defendant's case

that have not already been disclosed.  If the Government discovers any other witnesses favorable to

Defendant, the names of such witnesses will be promptly provided.

**(17)     Statements Relevant to the Defense**

The Government will provide all statements relevant to Defendant as required by Rule 16,

<u>Brady</u>, and <u>Jencks</u>.    The Government is not all possible information and evidence regarding any

speculative defense claimed by Defendant.  <u>Wood v. Bartholomew</u>, 516 U.S. 1, 6-8 (1995) (<u>per</u> <u>curiam</u>)

(holding that inadmissible materials that are not likely to lead to the discovery of admissible exculpatory

evidence are not subject to disclosure under <u>Brady</u>).

**(18)     Jencks Act Material**

Rule 26.2 incorporates the Jencks Act, 18 U.S.C. §3500, into the Federal Rules of Criminal

Procedure. The Jencks Act requires that, after a Government witness has testified on direct examination,

the Government must give the Defendant any "statement" (as defined by the Jencks Act) in the

Government's possession that was made by the witness relating to the subject matter to which the

witness testified. 18 U.S.C. §3500(b).  For purposes of the Jencks Act, a "statement" is (1) a written

statement made by the witness and signed or otherwise adopted or approved by her, (2) a substantially

verbatim, contemporaneously recorded transcription of the witness's oral statement, or (3) a statement

by the witness before a grand jury. 18 U.S.C. §3500(e).   If notes are read back to a witness to see

whether or not the government agent correctly understood what the witness was saying, that act

constitutes "adoption by the witness" for purposes of the Jencks Act. <u>United States v. Boshell</u>, 952 F.2d

1101, 1105 (9th Cir. 1991) (<u>citing</u> <u>Goldberg v. United States</u>, 425 U.S. 94, 98 (1976)).  There is no

applicable Jencks material at this time.  If the case proceeds to trial, the Government will produce any materials covered by the Jencks Act relevant to the testifying witness(es).

**(19)   Giglio Information**

An agreement that the Government makes with a witness for testimony in exchange for money or in exchange for favorable treatment in the criminal justice system is generally subject to disclosure as impeachment evidence under Brady and Giglio.  See United States v. Kojayan, 8 F.3d 1315, 1322-23 (9th Cir. 1993); Benn v. Lambert, 238 F.3d 1040, 1054-60 (9th Cir. 2002).   The Government is not aware of any Giglio information related to this case.  If the Government discovers the existence of Giglio information, the information will be provided to the Defendant.

**(20) & (21)   Informants and Cooperating Witnesses and Bias by Informants and Witnesses**

The Government is not aware of any cooperating witnesses or informants at this time.  As indicated previously, the Government has produced the reports indicating the names of any percipient witness in this case.  The Government is aware of its obligations to produce exculpatory evidence and will continue to comply with the requirements to produce evidence under Brady and Giglio.

**III.**

**DEFENDANT'S MOTION TO DISMISS THE INDICTMENT DUE TO MISINSTRUCTION OF THE GRAND JURY**

**A.   Introduction**

Defendant makes contentions relating to two separate instructions given to the grand jury during its impanelment by this Court on January 11, 2007.  Although recognizing that the Ninth Circuit in United States v. Navarro-Vargas, 408 F.3d 1184 (9th Cir. 2005) (en banc) generally found the two grand jury instructions constitutional, Defendant here contends this Court went beyond the text of the approved instructions, and by so doing rendered them improper to the point that the Indictment should be dismissed.

Defendant urges this Court to dismiss the Indictment on two separate bases relating to grand jury procedures, both of which were discussed in United States v. Isgro, 974 F.2d 1091 (9th Cir. 1992).  Concerning the first attacked instruction, Defendant urges this Court to dismiss the Indictment by exercising its supervising powers over grand jury procedures.  This is a practice the Supreme Court

1   discourages as Defendant acknowledges, citing United States v. Williams, 504 U.S. 36, 50 (1992)

2   ("Given the grand jury's operational separateness from its constituting court, it should come as no

3   surprise that we have been reluctant to invoke the judicial supervisory power as a basis for prescribing

4   modes of grand jury procedure. "). [Id.] Isgro reiterated:

5          [A] district court may draw on its supervisory powers to dismiss an indictment.   The
           supervisory powers doctrine "is premised on the inherent ability of the federal courts to
6          formulate procedural rules not specifically required by the Constitution or Congress to
           supervise the administration of justice." Before it may invoke this power, a court must
7          first find that the defendant is actually prejudiced by the misconduct.   Absent such
           prejudice-that is, absent "'grave' doubt that the decision to indict was free from the
8          substantial influence of [the misconduct]"-a dismissal is not warranted.

9   974 F.2d at 1094 (citation omitted, emphasis added).  Concerning the second attacked instruction, in an

10  attempt to dodge the holding in Williams, Defendant appears to base his contentions on the Constitution

11  as a reason to dismiss the Indictment.  In Isgro, the Court stated:

12         [A] court may dismiss an indictment if it perceives constitutional error that interferes
           with the grand jury's independence and the integrity of the grand jury proceeding.
13         "Constitutional error is found where the 'structural protections of the grand jury have
           been so compromised as to render the proceedings fundamentally unfair, allowing the
14         presumption of prejudice' to the defendant." Constitutional error may also be found "if
           [the] defendant can show a history of prosecutorial misconduct that is so systematic and
15         pervasive that it affects the fundamental fairness of the proceeding or if the
           independence of the grand jury is substantially infringed."
16
17  974 F.2d at 1094 (citation omitted).

18         The portions of the two relevant instructions approved in Navarro-Vargas were:

19             You cannot judge the wisdom of the criminal laws enacted by Congress, that is,
           whether or not there should or should not be a federal law designating certain activity
20         as criminal.   That is to be determined by Congress and not by you.

21  408 F.3d at 1187, 1202.

22             The United States Attorney and his Assistant United States Attorneys will
           provide you with important service in helping you to find your way when confronted
23         with complex legal problems.   It is entirely proper that you should receive this
           assistance.  If past experience is any indication of what to expect in the future, then you
24         can expect candor, honesty, and good faith in matters presented by the government
           attorneys.

25  408 F.3d at 1187, 1206.

26         Concerning the "wisdom of the criminal laws" instruction, the court stated it was constitutional

27  because, among other things, "[i]f a grand jury can sit in judgment of wisdom of the policy behind a law,

28  then the power to return a no bill in such cases is the clearest form of 'jury nullification.'" 408 F.3d at

1203 (footnote omitted). "Furthermore, the grand jury has few tools for informing itself of the policy or legal justification for the law; it receives no briefs or arguments from the parties. The grand jury has little but its own visceral reaction on which to judge the 'wisdom of the law.'" Id.

Concerning the "United States Attorney and his Assistant United States Attorneys" instruction, the court stated:

> We also reject this final contention and hold that although this passage may include unnecessary language, it does not violate the Constitution. The "candor, honesty, and good faith" language, when read in the context of the instructions as a whole, does not violate the constitutional relationship between the prosecutor and grand jury. . . . The instructions balance the praise for the government's attorney by informing the grand jurors that some have criticized the grand jury as a "mere rubber stamp" to the prosecution and reminding them that the grand jury is "independent of the United States Attorney[.]"

408 F.3d at 1207. Id. "The phrase is not vouching for the prosecutor, but is closer to advising the grand jury of the presumption of regularity and good faith that the branches of government ordinarily afford each other." Id.

**B.    The Expanded "Wisdom of the Criminal Laws" Instruction Was Proper**

Concerning whether the new grand jurors should concern themselves with the wisdom of the criminal laws enacted by Congress, this Court gave the following instruction:

> You understood from the questions and answers that a couple of people were excused, I think three in this case, because they could not adhere to the principle that I'm about to tell you.
>
> But it's not for you to judge the wisdom of the criminal laws enacted by congress; that is, whether or not there should be a federal law or should not be a federal law designating certain activity is criminal is not up to you. That's a judgment that congress makes.
>
> And if you disagree with the judgment made by congress, then your option is not to say "Well I'm going to vote against indicting even though I think that the evidence is sufficient" or "I'm going to vote in favor of even though the evidence may be insufficient." Instead, your obligation is to contact your congressman or advocate for a change in the laws, but not to bring your personal definition of what the law ought to be and try to impose that through applying it in a grand jury setting.

Partial Transcript pp. 8-9.

Defendant acknowledges that in line with Navarro-Vargas, "this Court instructed the grand jurors that they were forbidden 'from judg[ing] the wisdom of the criminal laws enacted by Congress; that is, whether or not there should be a federal law or should not be a federal law designating certain activity [as] criminal is not up to you.'" [Def's Memorandum p. 7.] In concocting his theory of why

Judge Burns erred, Defendant posits that the expanded instruction renders irrelevant the debate about what the word "should" means. [Id. at p. 10-11.] Defendant contends, "the instruction flatly bars the grand jury from declining to indict because they disagree with a proposed prosecution." [Id. at 8] Defendant further contends that Judge Burns reinforced this flat prohibition when he "referred to an instance in the grand juror selection process in which he excused three potential jurors." [Id. at 8.] This argument combines two of the holdings in Navarro-Vargas in the hope they will blend into one. They do not.

Navarro-Vargas does permit flatly barring the grand jury from disagreeing with the wisdom of the criminal laws. The statement, "[y]ou cannot judge the wisdom of the criminal laws enacted by Congress," (emphasis added) authorized by Navarro-Vargas, 408 F.3d at 1187, 1202, is not an expression of discretion. Jury nullification is forbidden although acknowledged as a sub rosa fact in grand jury proceedings. 408 F.3d at 1204. In this respect, this Court was absolutely within its rights, and within the law, when it excused the three prospective grand jurors because of their expressed inability to apply the laws passed by Congress. Similarly, it was proper for this Court to remind the impaneled grand jurors that they could not question the wisdom of the laws. As we will establish, this reminder did not pressure the grand jurors to give up their discretion not to return an indictment. This Court's words cannot be parsed to say that they flatly barred the grand jury from declining to indict because the grand jurors disagree with a proposed prosecution, because they do not say that. That aspect of a grand jury's discretionary power (i.e. disagreement with the prosecution) was dealt with in Navarro-Vargas in its discussion of another instruction wherein the term "should" was germane.[4/] 408 F.3d at 1204-06 ("'Should' Indict if Probable Cause Is Found"). This other instruction bestows discretion on

---

[4/] That instruction is not at issue here. It read as follows:

> [Y]our task is to determine whether the government's evidence as presented to you is sufficient to cause you to conclude that there is probable cause to believe that the accused is guilty of the offense charged. To put it another way, you should vote to indict where the evidence presented to you is sufficiently strong to warrant a reasonable person's believing that the accused is probably guilty of the offense with which the accused is charged.

408 F.3d at 1187.

the grand jury not to indict.[5/]  In finding this instruction constitutional, the court stated in words that ring

true here, "It is the grand jury's position in the constitutional scheme that gives it its independence, not

any instructions that a court might offer."  408 F.3d at 1206.  The other instruction was also given by

this Court as follows:

> The function of the grand jury, in federal court at least, is to determine probable cause.  That's the simple formulation that I mentioned to a number of you during the jury selection process.  Probable cause is just an analysis of whether a crime was committed and there's a reasonable basis to believe that and whether a certain person is associated with the commission of that crime, committed it or helped commit it.
>
> If the answer is yes, then as grand jurors your function is to find that the probable cause is there, that the case has been substantiated, and it should move forward.  If conscientiously, after listening to the evidence, you say "No, I can't form a reasonable belief has anything to do with it, then your obligation, of course, would be to decline to indict, to turn the case away and not have it go forward.

Partial Transcript pp. 3-4.

> Probable cause means that you have an honestly held conscientious belief and that the belief is reasonable that a federal crime was committed and that the person to be indicted was somehow associated with the commission of that crime.  Either they committed it themselves or they helped someone commit it or they were part of a conspiracy, an illegal agreement, to commit that crime.
>
> To put it another way, you should vote to indict when the evidence presented to you is sufficiently strong to warrant a reasonable person to believe that the accused is probably guilty of the offense which is proposed.

Partial Transcript p. 23.

While the new grand jurors were told by this Court that they could not question the wisdom of

the criminal laws per <u>Navarro-Vargas</u>, they were also told that they had the discretion not to return an

indictment per <u>Navarro-Vargas</u>.  If a potential grand juror could not be dissuaded from questioning the

wisdom of the criminal laws, that grand juror should be dismissed as a potential jury nullification

---

[5/]The court upheld the instruction stating:

> This instruction does not violate the grand jury's independence.  The language of the model charge does not state that the jury "must" or "shall" indict, but merely that it "should" indict if it finds probable cause.  As a matter of pure semantics, it does not "eliminate discretion on the part of the grand jurors," leaving room for the grand jury to dismiss even if it finds probable cause.

408 F.3d at 1205 (confirming holding in <u>United States  v. Marcucci</u>, 299 F.3d 1156, 1159 (9th Cir. 2002) (per curiam)).  "In this respect, the grand jury has even greater powers of nonprosecution than the executive because there is, literally, no check on a grand jury's decision not to return an indictment. 408 F.3d at 1206.

1    advocate.  See Merced v. McGrath, 426 F.3d 1076, 1079-80 (9th Cir. 2005).  Thus, there was no error

2    requiring dismissal of this Indictment by this Court exercising its supervisory powers.

3         Although Defendant argues that this Court used the excusing of the prospective grand jurors as

4    a method of coercing the impaneled grand jurors to return indictments every case where there is

5    probable cause, the Partial Transcript reveals that did not happen.  When instructing the impaneled

6    grand jurors this Court said:

7           You understood from the questions and answers that a couple of people were excused,
            I think three in this case, because they could not adhere to the principle that I'm about
8           to tell you.

9           But it is not for you to judge the wisdom of the criminal laws enacted by congress; that
            is whether or not there should be a federal law or should not be a federal law designating
10          certain activity as criminal is not up to you.

11   [Partial Transcript, p. 8.]  This passage simply does not evoke the "you must indict no matter what"

12   scenario proposed by Defendant.  This Court was simply reminding the impaneled grand jurors of their

13   obligation not to judge the wisdom of the criminal laws, which all the cases allow.  Further, a reading

14   of the dialogues between this Court and the three excused jurors found in the Supplemental Transcript

15   reflects a measured, thoughtful, almost mutual decision, that those three individuals should not serve

16   on the grand jury because of their views.  This Court's reference back to those three colloquies cannot

17   be construed as pressuring the impaneled grand jurors, but merely bespeaks a reminder to the grand jury

18   of their duties.

19        Finally, even if there was an error, Defendant has not demonstrated he was actually prejudiced

20   thereby, a burden he has to bear.  "Absent such prejudice--that is, absent 'grave' doubt that the decision

21   to indict was free from the substantial influence of [the misconduct]'--a dismissal is not warranted."

22   Isgro, 974 F.2d at 1094.

23   **C.    The Addition to the "United States Attorney and his Assistant United States Attorneys"
            Instruction Did Not Violate the Constitution**

24

25        Concerning the new grand jurors' relationship to the United States Attorney and the Assistant

26   U.S. Attorneys, this Court stated:

27          Now, again, this emphasizes the difference between the function of the grand jury
            and the trial jury.  You're all about probable cause.  If you think that there's evidence out
28          there that might cause you to say "well, I don't think probable cause exists," then it's
            incumbent upon you to hear that evidence as well.  As I told you, in most instances, the

15

U.S. Attorneys are duty-bound to present evidence that cuts against what they may be asking you to do if they're aware of that evidence.

Partial Transcript p. 20.[6/]

As a practical matter, you will work closely with government lawyers. The U.S. Attorney and the Assistant U.S. Attorneys will provide you with important services and help you find your way when you're confronted with complex legal matters. It's entirely proper that you should receive the assistance from the government lawyers.

But at the end of the day, the decision about whether a case goes forward and an indictment should be returned is yours and yours alone. If past experience is any indication of what to expect in the future, then you can expect that the U.S. Attorneys that will appear in front of you will be candid, they'll be honest, that they'll act in good faith in all matters presented to you.

Partial Transcript pp. 26-27.

Defendant contends that the instructions discourage investigation by creating a presumption that in cases where the prosecutor does not present exculpatory evidence, no exculpatory evidence exists. [Id. at 8.] Defendant then concludes that "[a] grand jury so badly misguided is no grand jury at all under the Fifth Amendment. [Id.]

Frankly, this Court's statement that "the U.S. Attorneys are duty-bound to present evidence that cuts against what they may be asking you to do if they're aware of that evidence," is directly contradicted by United States v. Williams, 504 U.S. 36, 51-53 (1992) ("If the grand jury has no obligation to consider all 'substantial exculpatory' evidence, we do not understand how the prosecutor can be said to have a binding obligation to present it." (emphasis added)). However, the analysis does not stop there. As a former member of the United States Attorney's Office, the Court was undoubtedly aware of the provisions in the United States Attorneys' Manual ("USAM"),[7/] including USAM Section 9-11.233 thereof which reads:

In United States v. Williams, 112 S.Ct. 1735 (1992), the Supreme Court held that the Federal courts' supervisory powers over the grand jury did not include the power to

---

[6/]Just prior to this instruction, this Court had informed the grand jurors that:

[T]hese proceedings tend to be one-sided necessarily. . . . Because it's not a full-blown trial, you're likely in most cases not to hear the other side of the story, if there is another side to the story.

Partial transcript p. 19.

[7/]The USAM is available on-line at www.usdoj.gov/usao/eousa/foia_reading_room/usam/index.html.

make a rule allowing the dismissal of an otherwise valid indictment where the prosecutor failed to introduce substantial exculpatory evidence to a grand jury. It is the <u>policy</u> of the Department of Justice, however, that when a prosecutor conducting a grand jury inquiry is personally aware of <u>substantial evidence that directly negates the guilt</u> of a subject of the investigation, the prosecutor <u>must present or otherwise disclose</u> such evidence to the grand jury before seeking an indictment against such a person. While a failure to follow the Department's policy should <u>not result in dismissal of an indictment</u>, appellate courts <u>may refer violations of the policy to the Office of Professional Responsibility</u> for review.

(Emphasis added.)[8/]  This policy was reconfirmed in USAM 9-5.001, Policy Regarding Disclosure of Exculpatory and Impeachment Information, Paragraph "A," "this policy does not alter or supersede the policy that requires prosecutors to disclose '<u>substantial evidence</u> that directly negates the guilt of a subject of the investigation' to the grand jury before seeking an indictment, <u>see</u> USAM §9-11.233." (Emphasis added.)[9/]

The facts that this Court's statement contradicts <u>Williams</u>, but is in line with self-imposed guidelines for United States Attorneys, does not create the constitutional crisis proposed by Defendant. No improper presumption/inference was created when the Court reiterated prosecutors' self-imposed duties to the new grand jurors.  Simply stated, in the vast majority of the cases the reason the prosecutor does not present "substantial" exculpatory evidence, is because no "substantial" exculpatory evidence exists.[10/]  If it does exist, as mandated by the USAM, the evidence should be presented to the grand jury by the Assistant U.S. Attorney.  Even if there is some nefarious slant to the grand jury proceedings when the prosecutor does not present any "substantial" exculpatory evidence, because there is none, the

---

[8/]<u>See</u> www.usdoj.gov/usao/eousa/foia_reading_room/usam/ title9/11mcrm.htm.

[9/]<u>See</u> www.usdoj.gov/usao/eousa/foia_reading_room/usam/title9/5mcrm.htm. Similarly, this new section does not bestow any procedural or substantive rights on defendants.

Under this policy, the government's disclosure will exceed its constitutional obligations. This expanded disclosure policy, however, does not create a general right of discovery in criminal cases. Nor does it provide defendants with any additional rights or remedies.

USAM 9-5.001, ¶ "E".  <u>See</u> www.usdoj.gov/usao/eousa/foia_reading_room/usam/title9/ 5mcrm.htm.

[10/]    This Court also told the grand jurors that:

[T]hese proceedings tend to be one-sided necessarily. . . . Because it's not a full-blown trial, you're likely in most cases not to hear the other side of the story, if there is another side to the story.

Partial transcript p. 19.

17

1    negative inference created thereby in the minds of the grand jurors is legitimate.  In cases such as

2    Defendant's, the Government has no "substantial" exculpatory evidence generated from its investigation

3    or from submissions tendered by the defendant.  There is nothing wrong  in this scenario with a grand

4    juror inferring that there is no "substantial" exculpatory evidence, or even if some exculpatory evidence

5    were presented, the evidence presented represents the universe of all available exculpatory evidence.

6         Further, just as the instruction language regarding the United States Attorney attacked in

7    Navarro-Vargas was found to be "unnecessary language [which] does not violate the Constitution," 408

8    F.3d at 1207, so too the "duty-bound" statement was unnecessary when charging the grand jury

9    concerning its relationship with the United States Attorney and her Assistant U.S. Attorneys, and does

10   not violate the Constitution.  In United States v. Isgro, 974 F.2d 1091 (9th Cir. 1992), the Ninth Circuit

11   while reviewing Williams established that there is nothing in the Constitution which requires a

12   prosecutor to give the person under investigation the right to present anything to the grand jury

13   (including his or her testimony or other exculpatory evidence), and the absence of that information does

14   not require dismissal of the indictment.  974 F.2d at 1096 ("Williams clearly rejects the idea that there

15   exists a right to such 'fair' or 'objective' grand jury deliberations.").  That the USAM imposes a duty

16   on United States Attorneys to present "substantial" exculpatory evidence to the grand jury is irrelevant

17   since by its own terms the USAM excludes defendants from reaping any benefits from the self-imposed

18   policy.  Therefore, while the "duty-bound" statement was an interesting tidbit of information, it was

19   unnecessary in terms of advising the grand jurors of their rights and responsibilities, and does not cast

20   an unconstitutional pall upon the instructions which requires dismissal of the indictment in this case or

21   any case.  The grand jurors were repeatedly instructed by Judge Burns that, in essence, the United Sates

22   Attorneys are "good guys," which was authorized by Navarro-Vargas.  408 F.3d at 1206-07 ("laudatory

23   comments . . . not vouching for the prosecutor").  But he also repeatedly "remind[ed] the grand jury that

24   it stands between the government and the accused and is independent,"  which was also required by

25   Navarro-Vargas.  408 F.3d at 1207.  In this context the unnecessary "duty-bound" statement does not

26   mean the instructions were constitutionally defective requiring dismissal of this indictment or any

27   indictment.

28         The "duty bound" statement constitutional contentions raised by Defendant do not indicate that

18

the "'structural protections of the grand jury have been so compromised as to render the proceedings fundamentally unfair, allowing the presumption of prejudice' to the defendant," and "[the] defendant can[not] show a history of prosecutorial misconduct that is so systematic and pervasive that it affects the fundamental fairness of the proceeding or if the independence of the grand jury is substantially infringed." Isgro, 974 F.2d at 1094 (citation omitted). Therefore, this Indictment, or any other indictment, need not be dismissed.

**IV.**

**SUPPRESS EVIDENCE**

Defendant contends that the investigatory stop that preceded the discovery of aliens in the vehicle was unconstitutional. According to Defendant, the agents did not have reasonable suspicion to conduct the vehicle stop, the means used to effectuate the stop (use of a Controlled Tire Deflation Device, hereinafter "CTDD") required probable cause and, in any case, use of a CTDD is an excessive use of force. Def. Mem. at 18-25. Defendant is wrong on all three counts.

**A.    Border Patrol Agents Had Reasonable Suspicion to Stop Defendant's Vehicle**

       **1.    Applicable Law**

The Fourth Amendment prohibits unreasonable searches and seizures by the Government, and its protections extend to brief investigatory stops of persons or vehicles that fall short of traditional arrest. United States v. Arvizu, 534 U.S. 266, 273 (2002). Because the balance between the public interest and the individual's right to personal security tilts in favor of a standard less than probable cause in such cases, the Fourth Amendment is satisfied if the officer's action is supported by reasonable suspicion to believe that criminal activity may be afoot. Id. at 273. Although an officer's reliance on a mere hunch is insufficient to justify a stop, the likelihood of criminal activity need not rise to the level required for probable cause, and it falls considerably short of satisfying a preponderance of the evidence standard. Id. at 274.

An investigatory stop must be justified by some objective manifestation that the person stopped is, or is about to be, engaged in criminal activity. Id. at 273. When a court seeks to make a determination whether reasonable suspicion exists, the finder of fact must look at the "totality of the circumstances" of a given case to see whether the detaining officer had a "particularized and objective

19

basis" for suspecting legal wrongdoing.  Id.  This process allows the officers to draw on their own experience and specialized training to make inferences from and deductions about the cumulative information available to them that "might well elude the untrained person." Id. at 273; United States v. Diaz-Juarez, 299 F.3d 1138, 1141 (9th Cir. 2002).  Moreover, individual factors that may appear innocent in isolation may constitute suspicious behavior when aggravated together. Diaz-Juarez, 299 F.3d at 1141, *citing* United States v. Sokolow, 490 U.S. 1, 9-10 (1989).

In United States v. Brignoni-Ponce, 422 U.S. 873 (1975), the Supreme Court listed a number of non-exclusive factors, the totality of which gave rise to reasonable suspicion.  Most of those factors are identical to the ones present in the case at bar: (1) characteristics of the area; (2) proximity to the border; (3) usual patterns of traffic and time of day; (4) previous alien or drug smuggling in the area; (5) behavior of the driver including obvious attempts to evade officers; (6) model and appearance of the vehicle; and (7) officer experience. Id. at 884-85; United States v. Sigmond-Ballesteros, 309 F.3d 545, 547 (9th Cir. 2002); United States v. Tiong, 224 F.3d 1136, 1139 (9th Cir. 2000).

**2.    The Merits of the February 17, 2008 Stop**

The facts surrounding the apprehension of Defendants in this case will be developed through testimony at the evidentiary hearing.  The Government anticipates that the testimony will establish:

- Defendant was apprehended on Interstate 8 near the intersection with Highway 98.  I-8 in this area is a well-known alien smuggling route for a number of reasons including its proximity to the border.  Defendant's vehicle was the only vehicle on the road in the early morning hours of Sunday, February 17th (President's Day Weekend) other than Border Patrol vehicles.

- Defendant was driving a beige 1983 Chevrolet Southwind Motor Home.  Alien smuggling organizations typically utilize large vehicles of this variety in order to blend in with recreational travelers, particularly during holiday seasons.

- An RVSS scope operator saw the aliens load into the vehicle on the side of I-8 and simultaneously reported it to the Border Patrol agents who had been tracking the aliens north from the border.  The RVSS scope operator maintained constant visual surveillance of the vehicle as it continued eastbound in I-8 and approached Agent Contreras's position near the East Y.  When Agent Contreras obtained visual surveillance of a vehicle approaching his position, he confirmed with the RVSS operator

that the vehicle was in fact the same vehicle that the suspected illegal aliens had boarded.

- Agent Contreras attempted a vehicle stop by activating his vehicle's emergency lights and sirens. Agent Contreras drove back and forth across the lane behind the vehicle to ensure that the driver could see the activated lights despite the large size of the vehicle. The vehicle did not yield for at least <u>five</u> minutes.

- The agents broadcast the failure to yield ("FTY"), indicating over the radio on at least two occasions that the vehicle had failed to yield. Agent Vega-Torres saw Agent Contreras following the motor home with the activated lights. Agent Vega-Torres deployed the controlled tire deflation device ("CTDD") when the vehicle continued to fail to yield.

In the present case, virtually all the factors identified by the Supreme Court in <u>Brignoni-Ponce</u> as giving rise to reasonable suspicion were present here. First, the area of the I-8 were the Defendant was driving is known for being heavily utilized by alien smugglers given its close proximity to the border. The proximity to the border is particularly evident here where the aliens, who were being followed by Border Patrol agents, were actually able to successfully walk from the border where they had crossed in the canal to the side of the I-8 where they were picked up. The pattern of traffic and time of day also gave rise to reasonable suspicion: Defendant's vehicle was the only other vehicle on the road at approximately 5:25 a.m. on a Sunday morning. Defendant's behavior further solidified the reasonable suspicion: he was observed pulling over on the side of the I-8 and picking up a group of 10 people who had just walked from the border. There are very few innocent explanations for a vehicle stopping along the side of the I-8 at 5:25 a.m. on a Sunday morning to pick up 10 people; there are no innocent explanations when those 10 people have just been tracked walking north from the U.S./Mexico border. Moreover, based on the agents' experience, the model and appearance of the vehicle also gave rise to reasonable suspicion. Agents knew that alien smuggling organizations use vehicles in an attempt to blend in with recreational travelers, especially during the holidays. The combination of all these factors clearly gave the agents reasonable suspicion to stop the motor home.

Defendant argues that the agents did not have reasonable suspicion to stop the motor home because the early reports about the vehicle described it as a "van-like" vehicle. Def. Mem. at 21-22. Defendant argues that the agents therefore did not have particularized basis for stopping a motor home,

1   which he argues is "neither a van nor a van-type vehicle." Id. at 22. Defendant's argument misses

2   several critical facts. The scope operator, who initially identified the vehicle as "van-like" was looking

3   through a scope from a distance and was providing rough descriptions based on the view available to

4   the operator. The scope operator maintained surveillance of the vehicle and maintained communication

5   with Agent Contreras, who was in his vehicle on I-8, until Agent Contreras obtained visual surveillance.

6   At that time, Agent Contreras confirmed that Defendant's vehicle was in fact the same vehicle that the

7   10 people had loaded into. His closer proximity enabled him to observe that the vehicle was actually

8   a motor home. The fact that the agents or scope operators at various times referred to the motor home

9   as a van, also a large motorized vehicle that can transport numerous people, does not detract from the

10  reasonable suspicion generated by the whole set of circumstances. The vehicle – by whatever descriptor

11  it was referred – was the only other vehicle on the otherwise deserted interstate. The agents were all

12  clear that they were discussing the same vehicle, and therefore their collective observations about the

13  vehicle appropriately gave rise to reasonable suspicion.

14          Defendant's argument that his maneuvers of turning from I-8 East onto Hwy-98 are not

15  suspicious because they are legal driving maneuvers is similarly unavailing. Def. Mem. at 22.

16  Defendant argues that his vehicle maneuvering is consistent with someone "dropp[ing] off field workers

17  in the early morning hours, or . . . returning from visiting a friend in the Eastern part of Date City." Def.

18  Mem. at 23. Defendant misses the fact that it is the combination of circumstances, not the single act

19  of changing highways or changing direction, that gives rise to reasonable suspicion. Defendant didn't

20  drop off field workers. To the contrary, he picked up ten people off the side of the road – ten people

21  who had just been followed walking north from the border between the U.S. and Mexico. When

22  combined with the fact that the vehicle had just picked up, not dropped of, ten people on the side of the

23  road at 5:25 a.m., the directional change was absolutely suspicious. This case is nothing like the

24  Sigmund-Ballesteros case cited by Defendant, where the reasonable suspicion boiled down to "a man

25  driving a large pick up truck northbound on Highway 86 at 4:20 in the morning." 285 F.3d 1117, 1127

26  (9th Cir. 2002). The combination of circumstances provides far more extensive support of reasonable

27  suspicion.

28          Lastly, Defendant argues that the fact that the vehicle was a motor home cannot give rise to

reasonable suspicion because it is too common and it "sweeps too many members of society into its dragnet." Def. Mem. at 23. Yet again, Defendant's argument overlooks the fact that it was this fact in combination with other circumstances that gives rise to reasonable suspicion. If the sole reason Defendant was pulled over was because he was driving a motor home, Defendant might have a point. But as Defendant himself acknowledges, "the court must look to the totality of the circumstances." Def. Mem. at 23, *citing* United States v. Arvizu, 534 U.S. 266 (2002). Here, Border Patrol Agents didn't just pull over each and every motor home, but rather pulled over this motor home because it had stopped along the side of the road and picked up ten people who had just walked north from the U.S./Mexico border. It is hard to imagine a set of circumstances that could more strongly give rise to reasonable suspicion.

Clearly, the agents had reasonable suspicion to conduct an investigatory stop of Defendant's vehicle at the time they announced over the radio that they were going to conduct a stop. As the Court explained in Tiong, even if Defendant could come up with "a possible innocent explanation for every police observation," that would not undermine reasonable suspicion. 224 F.3d 1136, 1140 (9th Cir. 2000); *see also* United States v. Crapser, 472 F.3d 1141, 1147-48 (9th Cir. 2007); Diaz Juarez, 299 F.3d at 1142-43. In addition, Defendant's subsequent failure to yield (*see* Exh. G) to the agents' lights and sirens served to amplify the reasonable suspicion. *See* United States v. Smith, 217 F.3d 746 (9th Cir. 2000) (a suspect is not seized for purposes of the Fourth Amendment until "the suspect is physically subdued or submits to the assertion of authority;" "evasive actions contribute to the totality of circumstances suggesting reasonable suspicion"); United States v. Santamaria-Hernandez, 968 F.2d 980, 984 (9th Cir. 1992). Under the totality of the circumstances, the agents had ample reasonable suspicion to stop Defendant by the time he crossed the CTDD. Therefore, this Court should deny Defendant's motion to suppress evidence.

**B.**     **Border Patrol Agents Did Not Use Excessive Force in Stopping the Vehicle**

Defendant also seeks to suppress evidence in this case by arguing that use of a CTDD to conduct a stop requires probable cause and that the use of a CTDD is an excessive use of force. Neither argument has merit.

**1.**     **Use of a CTDD Requires Only Reasonable Suspicion, Not Probable Cause**

1     Border Patrol Agents need only reasonable suspicion to conduct a vehicle stop using a CTDD.

2   *See* United States v. Payan-Valenzuela 06CR2158-JM, 2007 WL 2712278 (September 14, 2007)

3   (finding that only reasonable suspicion is required to conduct a vehicle stop with a CTDD). Officers

4   making investigatory stops are "authorized to take such steps as [are] reasonably necessary to protect

5   their personal safety and to maintain the status quo during the course of the stop." United States v.

6   Hensley, 469 U.S. 221, 235 (1985); see also Alexander v. County of Los Angeles, 64 F.3d 1315, 1320

7   (9th Cir. 1995) ("It is well settled that when an officer reasonably believes force is necessary to protect

8   his own safety or the safety of the public, measures used to restrain such as stopping them at gunpoint

9   and handcuffing them are reasonable.") There is no bright-line rule to determine when an investigatory

10  stop becomes an arrest. Washington v. Lambert, 98 F.3d 1181, 1185 (9th Cir. 1996).

11    Defendant's argument that the use of the CTDD is equivalent to an arrest is largely premised on

12  two cases involving airport detentions. Def. Mem. at 20. In Florida v. Royer, 460 U.S. 491 (1983), the

13  Supreme Court held that the defendant was arrested when officers seized his ticket, identification and

14  luggage and placed him in a "large closet" with two police officers accusing him of carrying narcotics.

15  Id. at 502-503. Similarly in United States v. Place, 464 U.S. 696 (1983), the Supreme Court found that

16  while luggage may be seized for the purpose of a brief investigation based on reasonable suspicion, a

17  seizure of luggage lasting 90 minutes requires probable cause. Id. at 706, 709-10. Defendant also cites

18  to United States v. Beck, 598 F.2d 497 (9th Cir. 1979), a case where officers had searched the suspects

19  at the border with no results, kept them under surveillance for four days with no results, used nine

20  officers to box in their taxi and then physically escorted each of the suspects to separate locations. Id.

21  at 500-501.

22    The situation presented here differs dramatically from the cases cited by Defendant. First,

23  contrary to Defendant's portrayal of the use of the CTDD as violent, the CTDD is a safety device,

24  designed to release the air from inflated tires in a gradual and regulated fashion. Use of the CTDD by

25  Border Patrol agents in this district dramatically reduces the number of alien and drug load vehicles that

26  would otherwise attempt to flee from impending arrest at high speeds, and use reckless or blatantly

27  dangerous maneuvers to do so. The roads and highways of this district are plagued with drug and alien

28  load vehicles fleeing at high speeds from law enforcement. To evade capture, the criminal drivers of

1    such vehicles behave irrationally, placing themselves, their passengers, and the motoring public at great

2    risk.  The CTDD safely disables a vehicle in a way that prevents its driver from resorting to high speed

3    when attempting to evade law enforcement.  Given that Defendant had already failed to yield to the

4    agents' attempts to stop the vehicle (*see* Exh.  G), the use of the CTDD was certainly justified and did

5    not elevate the stop into an arrest.  *See* Beck, 598 F.2d at 501 (utilization of force does not transform

6    a stop into an arrest where the use of force "is precipitated by the conduct of the individual being

7    detained or if it occurs under circumstances justifying fears for personal safety"); *see also* United States

8    v. Patterson, 648 F.2d 625, 633 (9th  Cir. 1981) ("an officer attempting to make an investigatory

9    detention may properly display some force when it becomes apparent that an individual will not

10    otherwise comply with his request to stop.").

11    **2.    Suppression of Evidence Is Not the Remedy**

12    Defendant argues the CTDD constituted an excessive use of force.  Def.  Memo.  at 18.  The

13    Ninth Circuit, however, has upheld the use of tire deflation devices.  In United States v. Hernandez-

14    Garcia, 284 F.3d 1135 (9th Cir. 2002), Border Patrol agents used a tire deflation device to stop a van

15    that drove across the international border in an area frequently used by alien smugglers, at a place not

16    designated as a point of entry.  The Ninth Circuit held that there was "no basis for invalidating the arrest

17    or suppressing evidence, on account of use of the spike mat."  Id. at 1140.  Even if the Court were to

18    find that the use of the CTDD was somehow unreasonable, Defendant has not cited a single case

19    supporting that suppression of evidence would be the appropriate remedy.

20    Suppression of evidence should be used as a "last resort" rather than a first impulse.  Hudson

21    v. Michigan, — U.S. —,  126 S.Ct. 2159, 2163 (2006) (holding suppression of evidence was not the

22    appropriate remedy for violation of the knock-and-announce rule).  Suppression of evidence is only

23    warranted where there is a causal connection between the Fourth Amendment violation and the seized

24    evidence.  Id. at 2164; *see also* Segura v. United States, 468 U.S. 796, 814 (1984) (suppression of

25    evidence not appropriate remedy where police conducted an illegal entry and then waited with the

26    suspect in the house for 19 hours until a search warrant was obtained because "[n]one of the information

27    on which the warrant was secured was derived from or related in any way to the initial entry into

28    petitioners' apartment"); United States v. Ankeny, — F.3d —, 2007 WL 2482059 (9th Cir. 2007).  In

1    <u>Ankeny</u>, officers had a valid search warrant, but the defendant argued that the evidence discovered

2    during the search should be suppressed because the manner of entry (police used a battering ram, rubber

3    bullets and two flash bang devices, one of which seriously injured the defendant) violated the Fourth

4    Amendment.  The Ninth Circuit declined to decide whether the manner of entry was reasonable, holding

5    that even if the police behaved unreasonably, suppression of evidence would be inappropriate because

6    the discovery of the evidence was not causally related to the manner of executing the search.

7        Here, as discussed above, agents had ample reasonable suspicion to stop Defendant's vehicle

8    and had activated their lights and sirens.  Regardless of the means used to effectuate the stop, the agents

9    would have discovered the aliens lying in the motor home as soon as Defendant yielded, therefore, the

10   evidence found is not causally connected to the use of the CTDD.  Accordingly, because the agents were

11   justified in stopping Defendant's vehicle, the manner of conducting the stop should not result in the

12   suppression of evidence.

13   **3.      Border Patrol Agents Had Probable Cause to Search the Vehicle**

14       Defendant further argues that after agents stopped the vehicle, they had "insufficient evidence

15   to conduct a warrantless, non-consensual search of the vehicle" and needed a warrant to enter the

16   vehicle.  Def. Mem. at 25.  Defendant's argument has no basis in the law.

17       The Fourth Amendment does not require that police obtain a warrant to search an automobile

18   when they have probable cause to believe it contains contraband or evidence of criminal activity.  *See*

19   <u>United States v. Ross</u>, 456 U.S. 798, 804-809 (1982); *see also* <u>United States v. Pinela-Hernandez</u>, 262

20   F.3d 974, 978 (9th Cir. 2001) (finding that police had probable cause to search vehicle because previous

21   surveillance indicated likelihood that vehicle contained contraband.)  Probable cause is "a fair

22   probability that contraband or evidence of a crime will be found in a particular place."  *See* <u>Illinois v.</u>

23   <u>Gates</u>, 462 U.S. 213, 238 (1983).  In the present case, the agents clearly had a basis to believe that there

24   was a "fair probability" the vehicle contained illegal aliens because they had seen the vehicle pick-up

25   ten people along the side of the I-8 who had walked north from the U.S./Mexico border and the vehicle

26   failed to yield to Border Patrol.

27   //

28   //

1   //

2                                   **V.**

3                          **SUPPRESS STATEMENTS**

4        Defendant asserts that his post-<u>Miranda</u> statements should be suppressed because Defendant

5   did not voluntarily waive his right and the advisal of rights violated <u>San Juan Cruz</u>.  Def. Mtn. at 25-

6   30.  This Court should deny the request to suppress Defendant's statements, which were made

7   voluntarily after a voluntary waiver of his <u>Miranda</u> rights.

8   **B.    <u>Defendant Was Properly Advised of His Miranda Rights</u>**

9            **1.    <u>Standards Governing Admissibility of Statements</u>**

10       A statement made in response to custodial interrogation is admissible under <u>Miranda v. Arizona</u>,

11  384 U.S. 437 (1966) and 18 U.S.C. § 3501, if a preponderance of the evidence indicates that the

12  statement was made after an advisement of rights, and was not elicited by improper coercion.

13  *See* <u>Colorado v. Connelly</u>, 479 U.S. 157, 167-70 (1986) (preponderance of evidence standard governs

14  voluntariness and <u>Miranda</u> determinations; valid waiver of <u>Miranda</u> rights should be found in the

15  "absence of police overreaching").  Although the totality of circumstances, including characteristics of

16  the defendant and details of the interview, should be considered, improper coercive activity must occur

17  for suppression of any statement.  *See* <u>id.</u> (noting that "coercive police activity is a necessary predicate

18  to the finding that a confession is not 'voluntary'"); *cf.* <u>Schneckloth v. Bustamonte</u>, 412 U.S. 218, 226

19  (1973) ("Some of the factors taken into account have included the youth of the accused; his lack of

20  education, or his low intelligence; the lack of any advice to the accused of his constitutional rights; the

21  length of detention; the repeated and prolonged nature of the questioning; and the use of physical

22  punishment such as the deprivation of food or sleep.") (citations omitted).  While it is possible for a

23  defendant to be in such a poor mental or physical condition that he cannot rationally waive his rights

24  (and  misconduct can be inferred based on police knowledge of such condition, <u>Connelly</u>, 479 U.S. at

25  167-68), the condition must be so severe that the defendant was rendered utterly incapable of rational

26  choice.  <u>See</u> <u>United States v. Kelley</u>, 953 F.2d 562, 564 (9th Cir.1992) (collecting cases rejecting claims

27  of physical/mental impairment as insufficient to prevent exercise of rational choice).

28  //

1 //

## 2.    Standards Governing Grant or Denial of Evidentiary Hearing

Under Ninth Circuit and Southern District precedent, as well as Southern District Local Criminal Rule 47.1(g)(1)-(4), a defendant is entitled to an evidentiary hearing on a motion to suppress only when the defendant adduces specific facts sufficient to require the granting of the defendant's motion. *See* United States v. Batiste, 868 F.2d 1089, 1093 (9th Cir. 1989) (where "defendant, in his motion to suppress, failed to dispute any material fact in the government's proffer, . . . . the district court was not required to hold an evidentiary hearing"); United States v. Moran-Garcia, 783 F. Supp. 1266, 1274 (S.D. Cal. 1991) (boilerplate motion containing indefinite and unsworn allegations was insufficient to require evidentiary hearing on defendant's motion to suppress statements); Crim. L.R. 47.1.  The local rule further provides that "the Court need not grant an evidentiary hearing where either party fails to properly support its motion for opposition."

Defendant has as much information as the Government in regards to the statements he made. *See* Batiste, 868 F.2d at 1092.  At least in the context of motions to suppress statements, which require police misconduct suffered by Defendant while in custody, Defendant certainly should be able to provide the facts supporting the claim of misconduct.  Finally, any objection that 18 U.S.C. § 3501 requires an evidentiary hearing in every case is of no merit.  Section 3501 requires only that the Court make a pretrial determination of voluntariness "out of the presence of the jury."  Nothing in section 3501 betrays any intent by Congress to alter the longstanding rule vesting the form of proof on matters for the court in the discretion of the court.  Batiste, 868 F.2d at 1092 ("Whether an evidentiary hearing is appropriate rests in the reasoned discretion of the district court.") (citation and quotation marks omitted).

## 3.    Adequate Proof to Support Rejection of a Motion to Suppress

The Ninth Circuit has expressly stated that a United States proffer based on the statement of facts attached to the complaint is alone adequate to defeat a motion to suppress where the defense fails to adduce specific and material facts.  *See* Batiste, 868 F.2d at 1092.  Moreover, the Ninth Circuit has held that a District Court may properly deny a request for an evidentiary hearing on a motion to suppress evidence because the defendant did not properly submit a declaration pursuant to a local rule.  See United States v. Wardlow, 951 F.2d 1115, 1116 (9th Cir. 1991); United States v. Howell, 231 F.3d 616,

620 (9th Cir. 2000) ("An evidentiary hearing on a motion to suppress need be held only when the moving papers allege facts with sufficient definiteness, clarity, and specificity to enable the trial court to conclude that contested issues of fact exist."); *see also* United States v. Walczak, 783 F. 2d 852, 857 (9th Cir. 1986) (holding that evidentiary hearings on a motion to suppress are required if the moving papers are sufficiently definite, specific, detailed, and nonconjectural to whether contested issues of fact exist). Even if Defendant provides factual allegations, the Court may still deny an evidentiary hearing if the grounds for suppression consist solely of conclusory allegations of illegality. *See* United States v. Wilson, 7 F.3d 828, 834-35 (9th Cir. 1993) (District Court Judge Gordon Thompson did not abuse his discretion in denying a request for an evidentiary hearing where the appellant's declaration and points and authorities submitted in support of motion to suppress indicated no contested issues of fact).

In this case, there is no question or dispute that Defendant was actually read his Miranda rights. Def. Mem. at 28-30. Defendant agreed to waive his rights. *See* Exh. A. The only issues raised by Defendant are whether San Juan Cruz was violated, and whether the agent's statement in response to Defendant's question regarding whether he would be deported rendered it involuntary. As articulated below, neither of these issues raises sufficient grounds for an evidentiary hearing.

**C.    Defendant's Post-Miranda Statements Did Not Violate San Juan Cruz**

Defendant cites San Juan Cruz and asserts that his post-Miranda waiver was not valid. Def. Mem. at 28.    In finding an invalid waiver in San Juan Cruz, the Ninth Circuit noted that the defendant was read two conflicting versions of his rights (one advised that an attorney would be appointed free of charge if he could not afford one, while the other did not). 314 F .3d 384, 388 (9th Cir. 2002). However, the Court also noted that an agent may rectify any confusion "by clarifying his statements or advising [a defendant] to disregard the Administrative Rights in favor of those that [are] read to him under Miranda." Id.

In the present case, Defendant was advised of his administrative rights at approximately 8:00 a.m. on February 17, 2008; he signed an acknowledgment of those rights on a Form I-826. *See* Exh. E. At 8:06 a.m., Defendant was advised of his Miranda rights, and was specifically advised of his right to an attorney. *See* Exh. A. Although the two sets of rights were read to him close in time, there is no

evidence – in the form of a declaration or otherwise – that Defendant was at all confused about his right to an attorney, the critical difference between the administrative rights and constitutional rights.  To the contrary, while Defendant actually asked a clarifying question about whether he would be deported, Defendant did not inquire further or demonstrate any confusion regarding the fact that his constitutional right to an attorney had attached and that he could invoke that right.  *See* Exh. A.  Accordingly, Defendant's waiver of his Miranda rights was valid and did not violate <u>San Juan Cruz</u>.

**D.**      **Defendant's Post Miranda Statements Were Voluntary**

Defendant argues that he did not voluntarily waive his Miranda rights because, prior to agreeing to waive his rights, he asked whether he would be deported and Border Patrol Agent Nelson Atiles advised Defendant that he would be deported.  Def. Mem. at 29.

In evaluating the voluntariness of post-arrest statements, courts ask "whether, considering the totality of the circumstances, the Government obtained the statement by physical or psychological coercion or by improper inducement so that the suspect's will was overborne." <u>United States v. Leon Guerrero</u>, 847 F.2d 1363, 1366 (9th Cir. 1988); *see also* <u>United States v. Miller</u>, 984 F.2d 1028, 1031 (9th Cir. 1993) (crucial question is whether the defendant's will was overborne when he confessed). The relevant circumstances include both the characteristics of the accused and the details of the interrogation. <u>Schneckloth v. Bustamonte</u>, 412 U.S. 218, 226 (1973).  At a minimum, coercive police activity is "a necessary predicate" to finding a confession involuntary. <u>Colorado v. Connelly</u>, 479 U.S. 157, 167 (1986).  A confession is voluntary if it is the "product of a rational intellect and a free will." <u>Medeiros v. Shimoda</u>, 889 F.2d 819, 823 (9th Cir.1989) (quoting <u>Townsend v. Sain</u>, 372 U.S. 293, 307 (1963)).  The crucial question is whether Defendant's will was overborne when he confessed. <u>See United States v. Miller</u>, 984 F.2d 1028, 1031 (9th Cir. 1988).

In the present case, there is no evidence to suggest that Defendant's statements were the result of any coercion or improper inducement.  After he was read his <u>Miranda</u> rights, Defendant asked Agent Atiles whether he was going to be deported to Mexico.  Agent Atiles gave an honest answer, quickly qualifying it with an explanation that Defendant needed to waive his rights before they could discuss the issue further:

Defendant:      The people you get like this.  Do you deport them to Mexico?

Agent:          Yes, but we are talking about this.  Are you willing to speak to me without the presence of an attorney?

Defendant:      Yes.

Exh.  A at 1.

Agent Atiles's answer to Defendant's question regarding whether he would be deported is correct – Defendant will be deported.  Regardless of the outcome of his case – whether Defendant pleads guilty, is found guilty by a jury, or is found not guilty – Defendant will be deported because he is a citizen of  Mexico present in the United States without authorization.  For Agent Atiles to have answered Defendant's question in the negative – to say that Defendant would not be deported – would have improperly led Defendant to believe that he was going to be permitted to remain in the United States.          Defendant did <u>not</u> ask whether he would be deported in lieu of criminal prosecution.  If Defendant's question was whether he would be deported instead of going to jail, Agent Atiles's answer would undoubtedly have been improper and misleading.  But since the question was merely whether Defendant would be deported, the answer that he would be deported was accurate.  Insofar as there was ambiguity to Defendant's question, i.e. insofar as Defendant intended his question to be whether he would be deported instead of going to jail, Agent Atiles would have needed to ask Defendant additional clarifying questions to make that determination and provide an accurate answer.  Clearly, to have asked Defendant more questions at that moment would have been improper because Defendant had not yet waived his rights.  Therefore, Agent Atiles's answer – "Yes, but we are talking about this.  Are you willing to speak to me without a the presence of an attorney?" – balanced the need for the agent to fairly and honestly answer Defendant's question, and at the same time not engage in a more extended conversation with Defendant until he had waived his right to an attorney.

Defendant argues that this was misleading because Defendant had been previously apprehended three times for being in the United States illegally and on each occasion was deported without prosecution.  Def.  Mem.  at 28.  Defendant's argument is unavailing because on those previous occasions, Defendant was merely in the United States illegally – there is no evidence that he was ever driving a load of illegal aliens on those occasions.  On this occasion, Defendant was apprehended as the driver of a vehicle containing illegal aliens.  Defendant himself acknowledged these circumstances in

his interview, admitting that he knew what he was doing was against the law:

Agent:           Well, then these people that they crossed, what did you think?  That it was right to pick them up?

Defendant:       No.

Agent:           What did you think then?  You knew it was against the law?

Defendant:       Yes.

Exh.  A at 9.  Defendant certainly had knowledge of the fact that this situation was different than his previous situations because he was engaged in the criminal act of driving other illegal aliens. Defendant's claim that he therefore expected to be treated as he had during his prior occasions of illegal entry is unavailing, and is unsupported by a declaration or affidavit.

Considering the totality of circumstances, these facts are insufficient to raise an inference that "the suspect's will was overborne" by the psychological pressure or inducements of agents.  The statements were not coerced – Defendant's waiver of his Miranda rights and his participation in the interview was voluntary.  Therefore, the statements should not be suppressed and no further evidentiary hearing is necessary.

## VI.

### SUPPRESS PHOTO LINE-UP IDENTIFICATION

Defendant challenges the photographic line-up in which all three material witnesses identified Defendant on the basis that it was highly suggestive and inherently prejudicial.  Def. Mem. at 30-31. The identifications were neither unnecessarily suggestive nor prejudicial, and therefore the photo line-up identifications should not be suppressed.

Courts have employed a two-step analysis to determine the admissibility of identification testimony. First, a defendant bears the burden of proving that the identification procedure was impermissibly suggestive.  Johnson v. Sublett, 63 F.3d 926, 929 (9th Cir. 1995).  The fact that a confrontation is suggestive does not establish a violation of due process..  Rather, the question is whether the confrontation "was so unnecessarily suggestive and conducive to irreparable mistaken identification that [defendant] was denied due process of law." Stovall v. Denno, 388 U.S. 293, 301-02 (1967). Johnson, 63 F.3d at 929.  To determine whether an identification procedure is so impermissibly

1  suggestive as to taint identification testimony in deprivation of Defendant's due process rights, the court

2  examines the "totality of the surrounding circumstances." United States v. Nash, 946 F.2d 679, 681 (9th

3  Cir. 1991). If the identification procedure was not impermissibly suggestive, the court's inquiry ends.

4  United States v. Bagley, 772 F.2d 482, 492 (9th Cir. 1988).

5        Even if the court determines that the identification procedure is impermissibly suggestive,

6  automatic exclusion of the identification testimony is not required. The court must determine whether

7  the testimony is nonetheless reliable. Manson v. Braithwaite, 432 U.S. 98, 113-114 (1977); Neil v.

8  Biggers, 409 U.S. 188, 196 (1972). To determine reliability, courts consider the five factors enumerated

9  in Biggers: (1) the witness' opportunity to view the defendant at the time of the crime; (2) the witness'

10  degree of attention; (3) the accuracy of the witness' prior description of the defendant; (4) the witness'

11  level of certainty when identifying the defendant at the confrontation; and (5) the length of time elapsed

12  between the crime and confrontation. Biggers, 409 U.S. at 199-200; Manson, 432 U.S. at 114-15.

13  **A.**    **The Photo Line-Up Was Not Impermissibly Suggestive**

14        Defendant argues that the identifications were impermissibly suggestive because the agents did

15  not provide a "neutral admonition" to the witnesses and instead asked them to identify the driver from

16  the photographs. Def. Mem. at 31. First of all, this is not factually accurate. A review of the witnesses

17  statements reveals that Israel Salmeron-Valle was first asked whether the driver was even among the

18  depicted photographs before being asked to identify the driver in the photographs. *See* Exh. B at 4.

19  Moreover, even if the officers failed to provide a "neutral admonition" to all the witnesses, this does not

20  render them impermissibly suggestive.

21        A review of this photographic line-up itself reveals that there is nothing suggestive about the

22  photographs. *See* Exh. F. All photographs are in black and white. All photographs are face and upper-

23  body photographs. All individuals in the photographs appear to have moustaches. All the individuals

24  appear to be of similar age. All the individuals also appear to be Latino, with similar skin coloring, and

25  have similar hair length and coloring. All are wearing hooded sweatshirts. Because the photographic

26  array depicts persons of similar appearance to Defendant in a similar manner, Defendant cannot meet

27  the first prong of the two part test of Stovall that the photographic line-up identification procedure was

28  impermissibly suggestive. As such, Defendant's motion should be denied without an evidentiary

1  hearing.

2  **B.    The Identification Testimony Is Reliable**

3      Even if this Court determines that the challenged identification procedure was impermissibly

4  suggestive, in-court identification testimony is still admissible if the reliability of the identification

5  outweighs any suggestiveness in the procedure. *See* United States v. Montgomery, 150 F.3d 983, 992

6  (9th Cir. 1998) (finding no due process violation even though DEA faxed a photo of Defendant to the

7  witness so that the witness could "have it right in [his] mind" to identify defendant.) An examination

8  of all the factors set forth in Biggers establish that the teller's identification is reliable.

9      First, the witnesses all had the opportunity to view the driver of the motor home as they boarded

10  the vehicle. This put all the witnesses in close proximity to Defendant. Moreover, the nature of the

11  crime is such that the witnesses – who were about to put their lives in the hands of this driver – would

12  necessarily have paid attention to that individual. *See* United State v. Burnette, 698 F.2d 1038, 1046

13  (9th Cir. 1983) (Although bank teller viewed the robber for approximately twelve seconds, his view was

14  unobstructed and at close range, and it could be reasonably inferred that during "life threatening"

15  moment, the teller's attention was sharply focused on the robber)

16      It also appears from the interviews that the individuals had been given the chance to previously

17  describe or identify the Defendant, making the accuracy of the recorded identification more likely. *See*

18  Exh. C at 4 ("I told the other one I think it looks like this.") The witnesses appeared to be generally

19  certain when identifying the defendant at the confrontation. *See* Exh. B at 4. Moreover, very little time

20  – less than 3 hours – had elapsed between the time the witnesses were picked up by Defendant and the

21  time they were asked to identify him on video. *See* United States v. Simoy, 998 F.2d 751, 752 (9th Cir.

22  1993) (identification by witness six days after crime reliable).

23      In sum, in light of the factors considered above, there is not a substantial likelihood of

24  misidentification by the three witnesses' photographic line-up identification of the defendant.

25  Moreover, when assessing reliability, courts may also consider the strength of other evidence against

26  Defendant. *See* United States v. DiTomasso, 817 F.2d 201, 214 n.17 (2d Cir. 1987) (identification

27  reliable when defendant's role as principal in a multi-million dollar heroin importation ring confirmed

28  by overwhelming evidence.) Here, the overwhelming evidence, including Defendant's confession,

1    establishes that Defendant was the driver of the motor home.  As such, the identification is reliable.

2                                              **VII.**

3              **DEFENDANT'S MOTION FOR LEAVE TO FILE ADDITIONAL MOTIONS**

4          The Government does not object to the granting of leave to file further motions as long as the

5    further motions are based on newly discovered evidence or discovery provided by the Government

6    subsequent to the instant motion at issue.

7                                               **V**

8                                          **CONCLUSION**

9          For the foregoing reasons, the Government requests that the Court deny Defendant's

10   motions, except where unopposed, and grant the Government's motion for reciprocal discovery.

11         DATED: April 7, 2008.

12

13                                              Respectfully submitted,

14                                              KAREN P. HEWITT
                                                United States Attorney
15

16
                                                /s/***Rebecca Kanter***
17                                              REBECCA S. KANTER
                                                Assistant United States Attorney
18                                              Attorneys for Plaintiff
                                                United States of America
19

20

21

22

23

24

25

26

27

28

                                              35

1

2

3                    UNITED STATES DISTRICT COURT

4                  SOUTHERN DISTRICT OF CALIFORNIA

5    UNITED STATES OF AMERICA,          )  Criminal Case No. 08cr0549-LAB
                                        )
6                           Plaintiff,  )
                                        )  CERTIFICATE OF SERVICE
7                     v.                 )
                                        )
8    SERGIO URUETA-HERREJON,            )
                                        )
9                           Defendant.  )
                                        )
10   ─────────────────────────────      )

11

12   IT IS HEREBY CERTIFIED THAT:

13        I, REBECCA S. KANTER, am a citizen of the United States and am at least eighteen years
     of age.  My business address is 880 Front Street, Room 6293, San Diego, California 92101-8893.
14
          I am not a party to the above-entitled action.  I have caused service of **RESPONSE AND
15   OPPOSITION TO DEFENDANT'S MOTIONS** on the following parties by electronically filing
     the foregoing with the Clerk of the District Court using its ECF System, which electronically notifies
16   them.

17        Steven F.  Hubachek

18        I hereby certify that I have caused to be mailed the foregoing, by the United States Postal
     Service, to the following non-ECF participants on this case:
19
          None
20
     the last known address, at which place there is delivery service of mail from the United States
21   Postal Service.

22        I declare under penalty of perjury that the foregoing is true and correct.

23        Executed on April 7, 2008.

24                                 /s/ *Rebecca Kanter*____
                                   REBECCA S. KANTER
25

26

27

28

36